## DAVID SHURTLEFF v. ALFRED STEVENS.

*Libel. Privileged Communication. Evidence. Burden of
Proof as to Actual Malice. Pleading. Damages.*

When a defamatory communication is fairly made in the discharge of some public
duty, moral or social, the occasion prevents the inference of malice that the law
ordinarily draws from such a communication, and affords a qualified defence, de-
pending on the absence of actual malice. Thus: In case for libel it appeared that
the Windham County Association, of which plaintiff and defendant were members,
was an association of Congregational ministers, organized in accordance with Con-
gregational usage, and having an association covenant and by-laws, to which any
Congregational minister residing in the county and of good standing, might, by
vote of the association, be admitted, and from which, on removal from the county,
he might be dismissed by a letter commending him to other like associations in
other counties; and that such associations were recognized by Congregational
churches, and membership thereof was considered among the churches as evidence
of good ministerial standing. At one of its regular meetings the association, being
actively incited thereto by the defendant, adopted by a unanimous vote the fol-
lowing preamble and resolutions: "Whereas, charges of untruthfulness, deception,
and creating disturbance among the churches, have been made against Rev. David
Shurtleff [the plaintiff], a member of this body, therefore : *Resolved*, that we
hereby withdraw fellowship from him till the 7th day of August next, at which
time he is invited to appear before our body, at Wilmington, and show reason why
he should not be finally dismissed without papers. *Resolved*, that the scribe be in-
structed to send a copy of this minute to the brother, and also to *The Congregation-
alist* and *The Vermont Chronicle."* Agreeably to the vote and resolutions the scribe
sent copies thereof, showing the votes, including the defendant's, to the newspapers
referred to, and they were therein published. It appeared that the former of those
newspapers was a denominational paper published at Boston, Mass., and circulated
among Congregationalists throughout New England; that the latter was a like
paper published at Montpelier, Vt., and circulated among Congregationalists in
Vermont; and that both were at the time of the publication, organs of Congrega-
tional churches, and of organizations and institutions connected therewith. For
several years prior to the publication complained of, reports of difficulties between
plaintiff and his parishioners were in circulation, and defendant had received let-
ters in relation thereto from time to time from ministers and parish committees in
various places where plaintiff was preaching, giving unfavorable accounts of his
career, and some of them speaking of him as unfit for the office and work of the
ministry, and asking defendant to do what he could to restrain him. *Held*, that
defendant's action before, and as a member of, the association, and the publica-
tion of the preamble and resolutions which were the result of that action, were
privileged.

*Held*, also, that the burden of proof as to whether defendant was actuated by actual
malice was on plaintiff.

Shurtleff *v*. Stevens.

Plaintiff was permitted to show that in consequence of the publication complained of, he lost the privilege of half-fare tickets on the railroads. The declaration contained no allegation of such damage. *Held*, that in the absence of such allegation, such evidence should not have been received, as such damage was not the natural proba-ble result of such publications.

Plaintiff was permitted to put in evidence a paper signed by one hundred and forty-two persons living in a town where he had preached, attesting his good character at a time about six years prior to the time of publication. *Held*, that the paper was not evidence, and that its admission was erroneous.

CASE FOR LIBEL. Plea, the general issue, and trial by jury, September Term, 1878, Ross, J., presiding.

The declaration alleged that by means of the wrong complained of, the plaintiff had been brought into public scandal and dis-grace, greatly injured in his good name, rendered unable to ob-tain employment in his profession, and thereby deprived of a large amount of money that he might and otherwise would have received therefor, greatly troubled in mind and body, "deprived of a large amount of sleep," and thereby made sick and rendered unable to attend to his usual duties.

It appeared that at the time of the publication complained of, there was an association of Congregational ministers in Windham County, having an association, covenant and by-laws, and organ-ized in accordance with Congregational usage, on October 19, 1775, under the name of the "Windham County Association," — an association to which any Congregational minister residing in the county, and of good standing, might, by vote of the associa-tion, be admitted, and from which, on removal from the county, he was entitled to be dismissed by a letter for that purpose, com-mending him to other like associations in other counties; such associations being recognized by Congregational churches, and membership thereof being considered among the churches and the associations as evidence of good ministerial standing. In 1870, the plaintiff, who was then a Congregational minister in Wind-ham County, was duly admitted to membership of the association. In 1873 he left the county, but never asked for nor received a letter of dismissal from the association, nor ever afterwards be-came a member of any like association. The defendant was also a Congregational minister in that county, having been pastor of the church at Westminster West Parish since 1842, and was also

a member of the association, having been admitted to membership in 1843, and been for many years a leading and active member.

It appeared further that the association, at a regular meeting held at West Townshend, on May 15 and 16, 1877, adopted by an unanimous vote the following preamble and resolutions :

Whereas charges of untruthfulness, deception, and creating disturbance among the churches, have been made against Rev. David Shurtleff, a member of this body, therefore :

*Resolved,* That we hereby withdraw fellowship from him till the 7th day of August next, at which time he is invited to appear before our body at Wilmington, and show reason why he should not be finally dismissed without papers.

*Resolved,* That the scribe be instructed to send a copy of this minute to the brother, and also to *The Congregationalist* and *The Vermont Chronicle.*

And the scribe of the association, pursuant thereto, sent a copy thereof and of said vote, showing the vote of the defendant, to each of the newspapers therein named, and they were published by both papers. The former of said newspapers was a denominational paper published at Boston, Mass., and circulated among Congregationalists throughout the New England States ; the latter, was a like paper published at Montpelier, Vt., and circulated among Congregationalists in Vermont ; and both of them were, at the time of the publication of the preamble and resolutions, organs of Congregational churches and of organizations and institutions connected therewith. The adoption of the preamble and resolutions, the adoption and publication of which constituted the publication complained of, was actively promoted by the defendant by speech and vote, but all that he did in reference to said publication he did as a member of the association at said meeting.

It appeared further that the plaintiff came to the ministry in 1868, and had since then been pastor of the church in Browningston, Vt., about a year, acting pastor of the church at Fayetteville, Vt., about three years, of the church at New Boston, N. H., a few months, and of the church at Shirley, Mass., where he was at and before the time of the publication, about two years, besides preaching as a supply for a short time in 1873, for the church at Alstead, N. H. A large amount of evidence was introduced

tending to show the history of the plaintiff's conduct in different places where he had acted as pastor of Congregational churches. The evidence on the part of the defendant tended to show that for several years prior to 1877, reports of difficulties between the plaintiff and his parishioners were in circulation ; that in July, 1873, the defendant received letters from one of the parish committee of the church at Alstead, where the plaintiff was then preaching, inquiring about the standing of the plaintiff as a minister, and saying that unfavorable reports of him were circulating in that vicinity, to which letters the defendant made reply, giving the desired information ; that he also received letters from the officers of the church at Brownington, giving an unfavorable account of his career there, which ended in his dismissal without the usual credentials attesting the confidence of the society in him as a minister ; and that he also received letters from Massachusetts, where the plaintiff was acting in his ministerial capacity, making like inquiries and giving like information, one of which was from Rev. H. Parker, of Shirley, under date of May 5, 1877, saying, in speaking of the plaintiff, " If you *can, do* stop this man from making more trouble in the churches. He is *unfit* for the office and work of the ministry. He belongs to no organization here, and we cannot reach him." Those letters were introduced in evidence as bearing on the question of the defendant's good faith, and received against the plaintiff's objection.

The plaintiff offered in evidence a copy of a record of certain proceedings of the church at Fayetteville, certified by the clerk of the church to be a true copy, whereby it appeared that when the plaintiff closed his labors there, the church passed resolutions expressing gratitude to him for his faithfulness, and confidence in him as " an upright Christian man, and a worthy minister of the gospel." He also offered in evidence a paper dated at Newfane, December 22, 1871, and signed by one hundred and forty-two persons, some of whom were church members and others of whom were not, attesting the plaintiff's worth, and the confidence of those persons in him as a man and a Christian. There was evidence tending to show that that paper was prepared for use by the plaintiff before the committee of the association at its meeting

at Brattleboro, in 1871, but none tending to show that it was so used, or that either the defendant or said committee or association, or any member thereof, other than the plaintiff, ever saw it, or knew of its existence. The defendant seasonably objected to the admission of that paper and of the copy of record, but the court admitted them; to which the defendant excepted.

After the copy of the church record had been received, the plaintiff called the clerk of the church, who produced and read the original record, which agreed with the certified copy, and testified that it was a true record. The defendant seasonably objected and excepted. The copy of the record was not read to the jury, but the original record was used instead. Said record and the paper signed as aforesaid were received as bearing on the question of the character and ministerial standing of the plaintiff.

The defendant offered no evidence as to the character or ministerial standing of the plaintiff in the church, or among the residents of Fayetteville and Newfane at the date of that paper, or at any other time, other than as already appears, but did offer evidence tending to show that the plaintiff's reputation and ministerial standing were bad in Brownington in 1871 and 1872, and also in Shirley at and before the time the association took action in 1877, as already stated. The plaintiff offered to show the contrary.

The defendant offered to show by the records of the association that it had been the practice of the association from its organization to discipline its members for unministerial conduct, and, when a member was suspended or expelled, to have its doings in that respect published in its denominational papers. That offer was rejected by the court; to which the defendant excepted.

The plaintiff claimed that the defendant had entertained ill will towards him since 1870, and introduced evidence in reference thereto. On the question of damages he testified, in effect, that railroad companies permitted ministers to travel on their roads on half-fare tickets, and that before the publication complained of he had had that privilege, but that in consequence of that publication he had lost it. The defendant seasonably objected and excepted to the admission of that testimony.

64

The defendant requested the court to charge that the occasion, and circumstances under which he did what it appeared that he did on May 16, 1877, furnished at least a *prima-facie* legal excuse; that the occasion and publication were conditionally privileged, so that the plaintiff, to recover, must have proved that the defendant was actuated by express malice; that, for whatever purpose the plaintiff relied on actual malice, whether to establish his right to recover or to increase damages, it was for him to establish it by a fair preponderance of evidence; that, the occasion being conditionally privileged, the burden was on the plaintiff to prove that the defendant took advantage of the meeting of the association, and of his membership, to injure the plaintiff, and did not act from a sense of duty. And the defendant claimed that it was the duty of the court to determine whether there was evidence of express malice, and, if not, to direct a verdict for the defendant — that that question should not be submitted to the jury unless the evidence raised a probability of malice; and requested the court to direct such a verdict. Upon the subject of that claim and request the court told the jury only that it was their duty to reconcile all the testimony with the theory of the defendant's good faith so far as it was consistent with such a view, and declined to comply otherwise therewith; to which the defendant excepted.

The court ruled that the publication of the preamble and resolutions in *The Congregationalist* and *The Vermont Chronicle* was libellous, and that, on the evidence, defendant was liable, and directed the jury to return a general verdict for the plaintiff, to assess the damages, and to distinguish the exemplary damages. The jury found for the plaintiff for $272.91 damages, and found the exemplary damages to be $1.

The court also prepared and submitted to the jury forms for special findings, charging them that it devolved on the defendant to establish by a fair preponderance of the evidence the affirmative of the second finding, and on the plaintiff to establish the third, and instructing them to fill the blanks in the forms as they might deem warrantable on the evidence. The forms were first submitted to defendant's counsel, and were not objected to. They were as follows:

First. The jury find that the alleged libel was written by the scribe of the association at a regular meeting of the association on May 16, 1877 ; that the defendant, then a member of the association, then brought the subject of taking action against the plaintiff before the association, and claimed and informed the association that the plaintiff had been guilty of
and then aided in forming, moved, and voted for the preamble and resolutions; that the preamble and resolutions were published in *The Congregationalist* and in *The Vermont Chronicle* by the scribe in compliance with the vote of the association and said resolutions ; and that that was all the defendant had to do in making and publishing the alleged libel.

Second. The jury further find that the defendant did       act therein solely from a sense of the duty that he owed to the association and the churches ; and that he did       then honestly believe, and then had       such knowledge of such facts and circumstances as would induce a man of ordinary prudence and conscience to believe that the plaintiff had been guilty of untruthfulness, deception, and creating disturbance in the churches.

Third. The jury further find that the defendant did
sieze on the occasion of said meeting to do the acts that we have found he did, in whole or in part from a desire and with the purpose of injuring the plaintiff in his standing and character as a minister and a man.

The jury filled the blank in the first form with the words " untruthfulness and deception," and the first blank in the second form with the word " not," leaving the remaining blanks in the second form and the blank in the third form unfilled.

To the refusal to charge as requested, to the charge given, as far as it related to the second special finding, and to the ordering of a verdict for the plaintiff the defendant excepted.

After the case was submitted and after the jury had had it under consideration for some time, they returned and inquired of the court whether they were at liberty to find that the defendant " did not act solely from a sense of duty," and also that the " defendant honestly believed and had knowledge of such facts and circumstances as would induce a man of ordinary prudence and conscience to believe that the plaintiff had been guilty of untruthfulness, deception, and creating disturbance in the churches," and that the defendant did " sieze on the occasion of the meeting of the association to do the acts with the purpose of injuring the

plaintiff." The defendant thereupon requested the court to charge that if they found that the "defendant honestly believed, and had knowledge of such facts and circumstances as would induce a man of ordinary prudence and conscience to believe that the plaintiff had been guilty of untruthfulness, deception, and creating disturbance in the churches," they would not be warranted in making the other findings suggested by their inquiry — that the findings were inconsistent. But the court declined · so to charge, and charged that the jury would be warranted in making the three findings, if, on all the evidence, they so found. To the refusal to charge as requested, and to the charge given, the defendant excepted.

*C. B. & C. F. Eddy* and *J. M. Tyler*, for the defendant.

The publication was privileged and the *prima-facie* inference of malice was rebutted; and the burden was on the plaintiff to prove actual malice. *Smith* v. *Higgins*, 16 Gray, 251; *Brow* v. *Hathaway*, 13 Allen, 239; *Swan* v. *Tappan*, 5 Cush. 110; *Gassett* v. *Gilbert*, 6 Gray, 94; *Atwill* v. *Mackintosh*, 120 Mass. 177; *Bradley* v. *Heath*, 12 Pick. 164; *Sheckell* v. *Jackson*, 10 Cush. 26; *Harrison* v. *Bush*, 5 E. & B. 344; *Bodwell* v. *Osgood*, 3 Pick. 379; *Watson* v. *Moore*, 2 Cush. 137; *Barrows* v. *Bell*, 7 Gray, 301, 312; *Jarvis* v. *Hathaway*, 3 Johns. 180; *Rector* v. *Smith*, 11 Iowa, 302; *Farnsworth* v. *Storrs*, 5 Cush. 412.

The court should have determined whether there was evidence of actual malice, and, if none, directed a verdict for the defendant. *Sheckell* v. *Jackson* and *Gassett* v. *Gilbert*, *supra; Remington* v. *Congdon*, 2 Pick. 310; *Nott* v. *Stoddard*, 38 Vt. 25, 32.

It was erroneous to submit the matter for special verdict, as the court did, and erroneous to give the instructions that were given in that connection.

It was erroneous to admit the evidence as to special damage by reason of the loss of half-fare tickets. There was no allegation of such damage.

It was erroneous to admit the church record and the paper signed by one hundred and forty-two persons. Neither paper was drawn for the purposes of the trial, nor with defendant's knowledge, nor in his presence.

*Davenport & Eddy*, for the plaintiff.

The publication alleged was proved, no evidence being given to contradict it. That would entitle the plaintiff to nominal damages at least. Townshend Slander, s. 402; 1 Saund. 130, n. 1; 1 Chit. Pl. 487 ; *Smart v. Blanchard*, 42 N. H. 137 ; *Hutchinson v. Wheeler*, 35 Vt. 330 ; *Nott v. Stoddard*, 38 Vt. 25.

The publication was not privileged. Even if meeting the requirements of a privileged publication in other respects, it was too widespread. Townshend Slander, ss. 299-247 ; *Fowler v. Bowen*, 30 N. Y. 20; *Popham v. Pickburn*, 7 H. & N. 89 ; *Joannes v. Bennett*, 5 Allen, 169 ; *Krebs v. Oliver*, 12 Gray, 239 ; *Gassett v. Gilbert*, 6 Gray, 94 ; *Aldrich v. Press Printing Co.* 9 Mass. 133.

The charge as to the burden of proof in the matter of the second special finding was correct.

The charge given in answer to inquiry by the jury was correct. 2 Greenl. Ev. ss. 421–423 ; 2 Stark. Ev. 468 ; *Harris v. Thompson*, 24 Eng. L. & Eq. 370 ; *Cork v. Wilders*, Ib. 284.

Evidence of the loss of the privilege of riding on the railroads at half fare was properly received. That was one of the rights and privileges of which the plaintiff was deprived. 1 Chit. Pl. 371, 458 ; *Dumont v. Smith*, 4 Denio, 319 ; Sedgw. Dam. 575 ; *Packard v. Slack*, 32 Vt. 9.

The paper with signatures, and the church record, were properly received. 1 Greenl. Ev. 101.

The offer of the defendant to show the custom of the association was properly refused.

The opinion of the court was delivered by

Powers, J. This is an action on the case for libel, and was tried on the plea of not guilty.

The Windham County Association of Congregational ministers, of which the plaintiff and defendant were both members, at a regular meeting held at West Townshend, on the 15th and 16th days of May, 1877, adopted the following preamble and resolutions, viz. :

" Whereas charges of untruthfulness, deception, and creating

disturbance among the churches, have been made against Rev. David Shurtleff, a member of this body, therefore :

" *Resolved*, That we hereby withdraw fellowship from him till the 7th day of August next, at which time he is invited to appear before our body at Wilmington, and show reason why he should not be finally dismissed without papers.

" *Resolved*, That the scribe be instructed to send a copy of this minute to the brother, and also to *The Congregationalist* and *The Vermont Chronicle*."

The defendant actively promoted, by speech and by vote, the adoption of the foregoing preamble and resolutions.

A large mass of evidence was introduced tending to show the history of the plaintiff's conduct in different places where he had officiated as pastor of Congregational churches, and where diffi-. culties between him and his parishioners had arisen. The defendant's evidence tended to show that for several years prior to 1877, reports of these difficulties were in circulation, and, as early as 1873, the defendant was written to by the parish committee of the church in Alstead, N. H., asking for the standing, as a minister, of the plaintiff, who was then preaching as a supply at that place, and saying that unfavorable reports of him were circulating in that locality. The defendant answered the letter, giving the information called for. The defendant received letters from the officers of the church at Brownington, Vt., where the plaintiff had been stationed as a minister, detailing an unfavorable history of his ministerial career there, which resulted in his dismissal from the pastoral relation, without the usual credentials attesting the confidence of his society in him as a clergyman. Similar information and letters of inquiry were received by the defendant from Massachusetts, where the plaintiff was officiating as a clergyman. On the 5th day of May, 1877, Rev. H. Parker, of Shirley village, Mass., addressed a letter to the defendant, in which, speaking of the plaintiff, he said : " If you *can*, *do* stop this man from making more troubles in the churches. He is *unfit* for the office and work of the ministry. He belongs to no organization here, and we cannot reach him." Shortly after the receipt of this letter, the proceedings of the Windham Association were initiated. The de-

fendant requested the court in substance to rule and hold that the circumstances under which and the occasion on which he did what he did in promoting the adoption of the resolutions at West Townshend and procuring their publication, were conditionally privileged, and that no recovery could be had unless the plaintiff satisfied the jury that the defendant was actuated by malice. The defendant further claimed that it was the province of the court to determine whether there was any evidence of malice, and if none was offered, a verdict should be ordered for the defendant. The court overruled these claims, and held that the publication of the preamble and resolutions in the two papers named, was libellous and actionable, and ordered a verdict for the plaintiff.

Herein was error. Two questions are properly raised on this branch of the case: 1st. Was the defendant's action before the association and as a member of it, *prima facie* privileged? 2d. Was the newspaper publication of the result of that action in like manner privileged?

The subject of privileged communications has been much discussed by courts and commentators in England and America within the past fifty years. In 1834, the Court of Exchequer, in *Toogood* v. *Spyring*, 1 C. M. & R. 181, speaking through Baron PARKE, one of the most learned of English judges, formulated a legal canon that has been adopted on both sides of the Atlantic since, as embodying the true ground upon which the publication of defamatory matter, whether written or oral, is privileged by the occasion or the circumstances under which it is made. In that case the court said: "In general an action lies for the malicious publication of statements which are false in fact and injurious to the character of another (within the well-known limits to verbal slander), and the law considers such publication as malicious, unless it is fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs in matters where his interest is concerned. In such cases the occasion prevents the inference of malice which the law draws from unauthorized communications, and affords a qualified defence depending upon the absence of actual malice. If fairly warranted by any reasonable occasion or exigency, and

honestly made, such communications are protected for the common convenience and welfare of society ; and the law has not restricted the right to make them within any narrow limits." And in elaborating the proposition, the court further on in the opinion, said : " I am not aware that it was ever deemed essential to the protection of such a communication that it should be made to some person interested in the inquiry, *alone*, and not in the presence of a third party."

In 1855, in *Harrison* v. *Bush*, 5 Ellis & B. 344, the Court of Queen's Bench, — LORD CAMPBELL, C. J., delivering the opinion— after reaffirming the same doctrine in language similar to that used by Baron PARKE, ·*supra*, said : " ' Duty,' in the proposed canon, cannot be confined to legal duties which may be enforced by indictment, action, or mandamus, but must include moral and social duties of imperfect obligation." Still later, in 1863, the Court of Common Pleas, in *Whiteley* v. *Adams*, 15 C. B. N. s. 417—ERLE, C. J., delivering the opinion, said : "Judges who have had from time to time to deal with questions as to whether the occasion justified the speaking or the writing of defamatory matter, have all felt great difficulty in defining what kind of social or moral duty, or what amount of interest, will afford a justification, but all are clear that it is a question for the judge to decide ; and I am clear that the letters in question, seeing the circumstances under which they were written, do not show what in law amounts to malice. I fully concur in the doctrine, referred to in Starkie on Slander, that it is important to get at the true character of persons you are obliged to be in communication with and to treat with confidence." The law as to privileged communications was formerly more restricted than it is at the present day. The case of *Peacock* v. *Sir George Reynal*, 2 Brownl. & G., 151, is an early and a very strong example. The rule has since become gradually more extended, upon the principle that it is to the general interest of society that correct information should be obtained as to the character of persons in whom others have an interest. If every word which is uttered to the discredit of another is to be made the ground of an action, cautious persons will take care that all their words are words of praise only, and will cease to obey the dic-

tates of truth. The privilege of criticizing and discussing the words and acts of public men has in modern times been very widely extended ; and so, also, has the rule as to giving information concerning private individuals, when given *bona fide*, and to a person having an interest in making the inquiry, and, in my judgment with very good reason." The court in terms approved the doctrine laid down in *Toogood* v. *Spyring* and *Harrison* v. *Bush,* above cited.

In *Whiteley* v. *Adams*, the doctrine of privilege was applied to a case involving these facts. The plaintiff, Whiteley, a member of Rev. Mr. Cleaver's congregation, having a controversy with one Fowler, Rev. Cleaver wrote to the defendant, a brother clergyman, asking him to act with Mr. Cleaver as an arbitrator of the disputed matters between Whiteley and Fowler. The defendant declined by letter to Mr. Cleaver, and, in giving his reasons, imputed gross misconduct to Whiteley, adding, " I think it my duty to unmask him to you." An action of libel was brought by Whiteley against the defendant, predicated upon this letter, and the court held that the letter was privileged on the ground that the defendant wrote it in what he believed to be the honest discharge of a social and moral duty, and on a subject in which he and Rev. Mr. Cleaver each had an interest.

The latest English case in point is *Clark* v. *Molyneux*, Law Rep. 3 Q. B. D. 237, decided in December, 1877. In that case, the plaintiff, Rev. Nassau Clark, was advertised in the public prints to preach in Rev. C. Smith's church, in a neighboring parish, one of a series of eight lenten sermons. The defendant, a member of a sister church, having received from credible sources information that led him to honestly believe that Rev. Clark had been guilty of the grossest immoralities, which unfitted him to enjoy the confidence of the church at Newton, where he was to preach on an occasion of special interest, communicated this information to Mr. Smith, the vicar of the church at Newton, and also to his own curate, in order to take his advice, and also to Rev. Mr. Maud, vicar of the church, in charge of which the plaintiff had been temporarily placed during Mr. Maud's absence on the continent. An action having been brought, the court held

that the defendant's communications were privileged, under the circumstances, unless the plaintiff could show that the defendant used his privilege for some indirect or wrong motive.

The last two cases show how the doctrine is applied by the highest courts in England, and demonstrate a progressive tendency in those courts to a more liberal construction of the canon announced by Baron PARKE in *Toogood* v. *Spyring*, as the changing usages, wants, and interests of society demand.

To come a little nearer home and nearer to the case at bar, the case of *Farnsworth and Wife* v. *Storrs*, 5 Cush. 412, may be referred to. In that case Mrs. Farnsworth had been charged with immoral conduct while a member of the Congregational Church in Braintree, Mass., of which the defendant was pastor. Having been disciplined according to the usages of the church, Mrs. Farnsworth was expelled, and the resolutions reciting the action of the church were publicly read to the congregation by the pastor, by order of the church. The pastor was sued for a libel. Chief Justice SHAW, speaking of the authority of churches to act in such cases, says: "Amongst these powers and privileges established by long and immemorial usage, churches have authority to deal with their members for immoral and scandalous conduct, and for that purpose to hear complaints, to take evidence and to decide; and, upon conviction to administer proper punishment by way of rebuke, censure, suspension or excommunication. To this jurisdiction, every member by entering into the church covenant submits, and is bound by his consent. The proceedings of the church are *quasi* judicial, and therefore those who complain, or give testimony, or act and vote, or pronounce the result orally or in writing, acting in good faith and within the scope of the authority conferred by this limited jurisdiction, and not falsely or colorably, making such proceedings a pretence for covering an intended scandal, are protected by law." A similar rule is laid down in Townshend on Slander and Libel, s. 237: "Every one who is aggrieved, or who has reasonable and probable cause to believe himself aggrieved, may in good faith seek redress from any body, officer or individual, having jurisdiction, power or authority to redress the wrong." To the same effect, 1 Hilliard on

Torts, 355 : "So words spoken or written in the regular course of church discipline, or before a tribunal of a religious society, to or of members of the church or society, are, as among the members themselves, privileged communications and not actionable without express malice." The same rule of privilege has been extended to the case of charges preferred in good faith by one member of a lodge of Odd Fellows against another for violating rules of the order. *Streety* v. *Wood*, 15 Barb. 105.

Now to apply the doctrine which has been announced in these cases, and which meets our approval, to the case in hand. The plaintiff became a member of the Windham County Association voluntarily. He entered into its covenant and subscribed to its rules. Under its covenant and rules it had rightful jurisdiction to investigate charges of unministerial conduct affecting its members, and on conviction to administer proper punishment. The good name and good standing of every member of the association was a matter of common interest to all the rest. The members were all representative men, largely responsible for the growth and prosperity of the churches under their charge. This association was an instrumentality whereby they could advance the common interests of denominational work in Windham County ; and by virtue of its relationship to like organizations elsewhere, it was a factor in the prosperity of the denomination throughout the land. Not only this, but the general public not immediately related to these clergymen by the ties of church covenant or society relationship, are more or less directly within the range of that moral influence which they are charged to exert. Thus the general cause of public morality which underlies all good government, and which every good citizen, be he priest or layman, is bound to promote, is affected by the fidelity with which ministers of the gospel discharge the high trust of their appointment. In order to be successful public teachers of morality, they must be unspotted public exemplars of it. Hence, if it be suspected that a wolf in sheep's clothing has invaded their ranks, and sits at their council board, it is not only for the *interest* of all the members of the association to know the fact, but it is their *imperative duty*, to make inquiry and *ascertain* the fact. They owe such duty to the

Shurtleff *v.* Stevens.

plaintiff as a brother member, if he is charged with scandalous conduct, to the end that his innocence may be established. They owe it to themselves, lest by indifference they give apparent approval to his conduct. Their intimate official relation to the plaintiff in the cause of their common work leaves them no other alternative; and if, in making such inquiry and in acting upon the subject-matter of it, they proceed with honesty of purpose and act from a sense of duty, the law protects them.

Secondly. The acts of the defendant, so far as he had to do with the charges against the plaintiff at West Townshend, being *prima facie* privileged, it remains to inquire whether he forfeited the protection of that privilege by authorizing the publication of the result of that meeting in the newspapers named. In other words, was the subject-matter of inquiry before the association at that time, one that concerned the association alone, and one in which the general public had no interest. That the character and conduct of a clergyman is a subject of public interest, not limited to the narrow circle of his parish, church, or denominational brotherhood, is abundantly established by adjudged cases.

In 1865, this question was before the Court of Queen's Bench, in England, in the cases of *Kelly* v. *Sherlock* and *Kelly* v. *Tinling*, Law Rep. 1 Q. B. 686, 699. The same person, a clergyman, was plaintiff in each case, and each case was an action for libel against the proprietor of a newspaper, for publishing, with editorial comment, defamatory matter of and concerning the plaintiff. It appeared that the plaintiff had some controversy with one of his church wardens, and also with his organist, and had preached one or two sermons reflecting upon the appointment of a Roman Catholic chaplain to the Liverpool borough gaol, and the election of a Jew, by the town council of Liverpool, to be their mayor. In the first case Baron BRAMWELL, in summing up the evidence to the jury, told them that, " anything which is calculated to bring a person into ridicule, hatred, or contempt, is a libel. Although that is true as a general rule, yet it is also true—and happy it is that it is true—that every man has a right to discuss matters of public interest. A clergyman with his flock, an admiral with his fleet, a general with his army, a judge with his jury — we are all

of us the subjects for public discussion.    So also is it matter of public interest, the dispute between the plaintiff and his organist, and the way in which the church is used — they are all public matters and may be publicly discussed."

In *Kelly* v. *Tinling* the defendant published in his paper a correspondence between the plaintiff and one of his church wardens, in which the warden complains to the plaintiff of the manner in which he suffers books to be sold to the congregation by his errand boy during divine service, and the way in which the vestry room is suffered to be used, &c.    The jury returned a verdict for the defendant, and the case came before the Queen's Bench on a motion for a new trial, on the ground that the publication by the defendant in his paper, was not "in a matter of public interest." The words between quotation marks, extracted from the motion, are given so that it may be seen that the court were called on to confront the precise question we have to deal with in the case at bar.    COCKBURN, C. J., said, in overruling the motion : " I cannot think that a dispute between a clergyman and his church-warden, as to what he allows to be done in church during divine service, and the uses to which he puts part of it, namely the vestry room, which were the matters involved in the correspondence between them, is not a subject of public interest.    The maintenance of decency and propriety in conducting public worship, and of the sanctity of the sacred edifice and all connected with it, is surely a matter of the greatest public concern.    The very use of the term ' public worship ' shows this."    And, to recur to the former of these cases, *Kelly* v. *Sherlock*, the summing up of BRAMWELL, B., above quoted, was read to the court in *Kelly* v. *Tinling.* Alluding to it, COCKBURN, C. J., said : " Every word of the summing up of the learned judge, which has been read, seems to me to have been said with the most perfect propriety."    These cases bring prominently and pointedly into the foreground, the proposition that the conduct of church affairs is a matter of general public interest that will authorize publications concerning it in the public prints.    But these cases also hold that such publication must be fair and temperate — that there must be no " excess of comment."    The English cases, however, are not the only source

of light on this subject. The same doctrine is fortified by the great strength of Chief Justice SHAW's opinion. In *Farnsworth* v. *Storrs, supra,* he held that the defendant was justified in promulgating the action of the church, publicly to his congregation. In the later case of *Barrows* v. *Bell,* 7 Gray, 301, 313, the defendant caused to be published in the *Boston Medical and Surgical Journal,* an article concerning the expulsion of the plaintiff from the Massachusetts Medical Society. Chief Justice SHAW laid down this salutary rule: " So many municipal, parochial, and other public corporations, and so many large voluntary associations, formed for almost every lawful purpose of benevolence, business, or interest, are constantly holding meetings, in their nature public, and so usual is it that their proceedings are published for general use and information, that the law, to adapt itself to this necessary condition of society, must of necessity admit of their public proceedings, and a just and proper publication of them, as far as it can be done consistently with private right."

Now if the manner in which a clergyman conducts his church service and uses his church edifice is a proper matter for comment in a newspaper of general circulation, *a fortiori,* " untruthfulness, deception, and creating disturbance in churches " are charges of personal unfitness that justify public comment in a denominational publication. No doubt a publication might be so made as of itself to bear palpable evidence of malice — as if it be made in an unusual number of papers having circulation without the circle of readers who would be likely to take an interest in the facts, or couched in extravagant language, or abounding in vilification. But where, as in *Barrows* v. *Bell,* it is made in a professional journal, and concerning a professional matter, or, as in this case, in a denominational journal, and concerning a denominational matter, it can hardly be said *per se* to furnish evidence of malice. The exceptions state that *The Congregationalist* and *The Chronicle* circulate among Congregationalists, and that they are organs of Congregational churches and organizations and institutions connected with said churches. From this statement of their circulation and relationship to the Windham County Association, it is manifest that the publication of the defamatory matter complained

of, was made to persons who had a direct interest in the proceedings against the plaintiff. This denomination clearly have a vital interest in the character and standing of its ministers. But if the publication reached the general public, the privilege is not lost. It is to be noticed that no editorial or other comment accompanies the publication, and nothing appears in it calculated to prejudice a fair trial of the charges at the time and place appointed. The law seems to place the publication of the proceedings of parliament, courts of justice, and *quasi* judicial tribunals upon the same level of protection. The only limitation that attaches to the privilege is, that the publication must not be made for the purpose of inflicting an injury but to promulgate facts which duty or interest require to be promulgated. *Campbell* v. *Spottiswoode,* 3 B. & S. 709; *Wason* v. *Walter,* Law Rep. 4 Q. B. 73; *Lawless* v. *Anglo-Egyptian Cotton Co.* Ib. 260; *Usill* v. *Hales,* Law Rep. 3 C. P. D. 319; *Kelly* v. *Sherlock, Kelly* v. *Tinling, Farnsworth* v. *Storrs,* and *Barrows* v. *Bell, supra.*

The rule is not, however, to be misapprehended. It is *not* the law, that, because a man fills a station before the public eye, he becomes thereby a target at which all the artillery of ridicule, ill will, or malice, may be leveled. He may be assailed when duty or interest demands it, and then, only under the rules of fair, temperate, conscientious criticism. Public station may ever be purified, never vilified.

The burden of proof to show that the publication is outside the privilege, or, in other words, is actuated by malice, is upon the plaintiff. *Clark* v. *Molyneux, supra; Spill* v. *Maule,* Law Rep. 4 Ex. 232; 1 Am. Lead. Cases, 193; Townshend Slander, 386; 2 Ad. Torts, 931. It was error to refuse the defendant's request as to the burden of proof upon the question of malice, and in charging the jury that the defendant must make out that he acted from a sense of duty.

The plaintiff, to show special damages, was allowed on the trial below to show that in consequence of the publication complained of he lost the privilege of a half-fare ticket on the railroad. No allegation of such special damage was made in the declaration. The defendant has the right to be informed by the declaration of

all claims for damages that the plaintiff will rely upon on the trial, in order that he may come prepared with his proofs to meet them. The natural and probable damage resulting from the wrongful act charged, he is bound to understand; but he is not bound to forecast such damages as are special and result from peculiar and exceptional circumstances. The evidence relating to the loss of the railroad ticket should have been excluded.

The plaintiff was allowed, against objection, to put in evidence a paper signed by one hundred and forty-two persons living in Newfane, attesting his good character in December, 1871. This evidence was admitted upon the theory that it tended to show the plaintiff to be a man of good character. We think the evidence was inadmissible. Witnesses who are to testify to facts material to the inquiry in court, must appear in court, where they can be seen and cross-examined. Moreover, if a good character *could* be established by a certificate gotten up as such documents usually are, no man need be without one.

*Judgment reversed, and new trial awarded.*