THE STATE EX REL. WILL H. ZORN v. ARGUS COX ET AL., Judges of Springfield Court of Appeals.—298 S. W. 837.

Division Two, October 10, 1927.

*J. N. Burroughs, Geo. T. Humphries* and *Schmook & Sturgis* for relator.

DAVIS, C.—This proceeding is here by virtue of a writ of *certiorari* directed to the Springfield Court of Appeals to review its opinion in the case of J. B. Aldridge, Respondent, v. Will H. Zorn, Appellant. The Court of Appeals awarded defendant a new trial, reversing the judgment and remanding the cause for errors in the instructions, but held that the question of the libelous nature of the publication was properly submitted to the jury to determine the fact. The jury in the trial court returned a verdict for $800, defendant appealing from the judgment entered thereon.

The petition sought recovery for the libelous publication of a newspaper article, the opinion of the Court of Appeals developing the following facts *in haec verba*.

"Defendant is editor and publisher of the Howell County Gazette, a · Democratic weekly newspaper printed and published at West Plains, in Howell County. September 4, 1924, there appeared in defendant's paper the article complained of. At the time plaintiff was sheriff and his son-in-law, Fred W. Juern, was a candidate for sheriff on the Republican ticket. The article upon which the alleged libel is founded is as follows:

" 'BOOZE AT RELIGIOUS REVIVAL AROUSES CITIZENS WHO MAKE PROTEST IN VAIN.

" 'The protracted meeting held by Rev. Laramore in the Christian Church at Moody continues. A few nights after the meeting began some of the boys in attendance showed signs of intoxication and acted rather queerly. After the close of the services two empty fruit jars that had contained moonshine liquor were found outside the church. This is the report brought to West Plains Wednesday by N. F. McCallon, one of the elders of the church.

" ' "I wrote a letter to the prosecuting attorney about this matter," said Mr. McCallon. "I wrote another to the sheriff, but neither one of them answered me or paid the least bit of attention to the mat-

.ter. There is somebody selling booze in our neighborhood, and we want the authorities to investigate it, and if they don't do it we will have it done on the first of next January, when there will be a change of affairs in this county," said Mr. McCallon.

" 'From Pottersville comes the same kind of reports. At the Odd Fellows picnic at Pottersville recently there were several drunks on the grounds. An officer from West Plains was present, but made no effort to see if he could find out where the liquor came from.

" 'The people of Howell County want a change and will get it in November.'

"McCallon, as a witness for defendant, testified that on July 15th, he wrote plaintiff 'about some fellow being drunk at church,' that the main part of the letter was about appointing a deputy; that on August 20th, he wrote plaintiff again 'about some fellow making a proposition to sell some liquor,' and 'told him if he and Fred come down we could catch onto something; I didn't tell him who the party was; just wrote him what a fellow told me.' McCallon also says that he again wrote plaintiff on the evening of September 'the first and mailed it on the morning of the second.' McCallon further testified that he was in West Plains on September 3rd, and talked to defendant, and that if plaintiff had replied to his letter of September 1st he would not have received it until after his return from West Plains on the third. McCallon also testified that neither the letter of July 15th, or August 20th, mentioned 'fruit jars with whiskey in them, for that hadn't come up yet.'

"Defendant testified that he met McCallon at the court house in West Plains and asked him 'how the meeting was getting along; I wanted to know so I could write an article about it for the paper. He told me they were having quite a lot of disturbance and they had found some empty fruit jars in which there had been whiskey outside the church. He said he had written the officers about it and had not heard from them.'

"Q. What, if anything, was said in that conversation about you publishing these matters? A. I didn't say anything about it, only I wanted to get a news item about the meeting down there . . . I published the article of my own initiative. I thought the people ought to know it, and I believe it to be the truth. Mr. McCallon has always been truthful with me. I have been connected with him in the bank down there and he has always been truthful and reliable.

"Q. The other part of the article referring to the Pottersville picnic affair, did you have any information of that affair? A. Yes. I was down at the Hollingshad Garage and Ben (Hollingshad) said there were several drunks at the Pottersville picnic and said there was an officer there and nothing was done about it. I had received this information before I wrote and published the article in question.

At the time I published this article I had heard of other disturbances over the county and complaints about the liquor law; had heard of a number of them before and quite a few afterwards.

"The letter which McCallon says was written on September first and mailed on the second is as follows:

"'Moody, Mo. 9-1-24.

"'DEAR JOE: There has been found a fruit jar near the church where the meeting is going on with whiskey in it. There is no doubt but that some one is making it near here. There was a lady told my wife that her son said some boys would go off in a certain direction of a night after church. It might be that this outfit could be found.

"'Your friend, N. F. McCALLON.'

"McCallon says he wrote this letter on the evening of September 1st, and mailed it at Moody on the morning of the second, but the envelope in which the letter was enclosed shows it to have been post-marked at Moody on September 4th. The original of the letter and the envelope were filed here for inspection and the envelope shows postmarked as stated. Also the letter shows on its face that a figure 4, following the 9 in the date line, has been partly erased and the figure 1 written over. The figure 4 is plainly discernible. Plaintiff testified that he got the letter the date of which is questioned on September 4th. 'I got it late in the afternoon and the Gazette came out about three or four o'clock.' Plaintiff also testified that in response to McCallon's letter about disturbance prior to the letter of September 4th, he informally designated or appointed Scott Hicks of the Moody neighborhood to look after the matter of keeping order among the boys, and McCallon and others say that Hicks made some effort in that direction. Plaintiff testified that he and Hallie Woodrel went to the Pottersville picnic 'to keep the drunks off the ground' and that he was there from 9:30 or 10 o'clock 'until they began to tear down,' and that he 'didn't see any drunks.' Defendant, however, introduced evidence tending to show that Ralph Harper, somewhat intoxicated, was on the picnic ground. But there is no claim made that plaintiff's attention was called to this boy. Other witnesses testified that they were at the picnic and saw no evidence of drinking. Ralph Harper was out of the State at the time of the trial, but Lem Stein testified that he was a brother-in-law of Harper; that he was with Harper all day at the picnic and that Harper was not drinking; that he and Harper were raised together and that he 'never knew of him taking a drink of intoxicating liquor.'"

Relator avers that the opinion of the Court of Appeals is in conflict with designated cases of this court, because the opinion holds, first, that the article published was not qualifiedly privileged; second, that plaintiff was cast with no duty to prove express malice; third, that an article published by defendant four years prior to the article

charged as libelous was competent as evidence to show malice, even though not pleaded and even though it was unrelated to the article in question.

I. With respect to the holding of the Court of Appeals, that the article was not qualifiedly privileged, relator cites to show a conflict the following cases: McClung v. Publishing Co., 279 Mo. 370, 214 S. W. 193; Diener v. Publishing Co., 230 Mo. 613, 132 S. W. 1143; Cook v. Publishing Co., 241 Mo. 326, 145 S. W. 480; Walsh v. Publishing Co., 250 Mo. 142, 157 S. W. 326; Branch v. Knapp & Co., 222 Mo. 580, 121 S. W. 93; McClung v. Publishing Co., 274 Mo. 194, 202 S. W. 571, and Clark v. McBaine, 299 Mo. 77, 252 S. W. 428.

The above cases warrant the principles, first, that the free comment and criticism of the public policy of a public official is justified when it relates to a matter of public interest, subject to its substantial truth and the want of malice; second, that, as to the qualified privilege, plaintiff bears the burden to show the falsity of the article, and the presence of express malice; third, that there must be good faith on the part of the utterer in publishing the article, with reason to believe and believing in its truth.

Inasmuch as the opinion of the Court of Appeals specifically refers to the petition, it then becomes the subject of our consideration in determining the question of conflict on *certiorari*. Our object, in referring to it, is to note the matter plaintiff complains of. Plaintiff states in the petition that the charges, that he ignored and paid no attention to the complaint of McCallon as to violations of law at Moody and that he was present at the Pottersville picnic, and there neglected and failed to perform his duties as Sheriff of Howell County, are false, taking exception to these two statements only. We approach the questions raised from the issue as thus laid by the petition.

II. Guided by the basic principles set forth in the cases above cited, we entertain no doubt that the alleged defamatory article was a comment upon the public policy of a public official, involving a matter of public interest. It related to a matter of public concern, that of intoxicated persons at public gatherings and to violations of the Prohibition Act. The article was therefore prima-facie qualifiedly privileged, for the above cases hold to the principle that a publication is prima-facie qualifiedly privileged where circumstances obtain with respect to a right or duty to communicate to others what of right they ought to know, even though it is not a legal, but only a moral or social duty of imperfect obligation.

III. The church meetings and the picnic were of local public interest, and the newspaper could be expected to print such news as related to it and comment thereon. Rumors regarding the violation of the liquor law were abroad and the opinion tends to show that defendant, relying upon the word of McCallon, awaited an opportunity to interview him before writing the article. The same may be said of the interview with Hollingshad. · It may be inferred from the opinion that defendant exercised due care in interviewing men on whose word he could depend. Be that as it may, with the burden on plaintiff to offer evidence tending to contradict good faith, which he failed to sustain, the opinion is not only void of an inference that the informants were unreliable, but it tends to show that they were trustworthy. As nothing appears to show negligence, the issue of the want of good faith, reason to believe and belief in the report of his informants was not sustained by plaintiff.

IV. The cases cited as in conflict hold that the alleged defamatory article must be read in its entirety and interpreted from its four corners. The opinion of the Court of Appeals recognized and utilized this rule, but in construing the evidence held that the article charged plaintiff with criminal nonfeasance. An analysis of the article develops that it is nothing more than an insistent demand for an investigation into the liquor conditions of a certain community and the prodding of the authorities to that end. The allegation, that a false article published by defendant charged that plaintiff failed to perform his duties as Sheriff of Howell County, in that he had received reports and communications about violations of the law at Moody, which he ignored and paid no attention to, we take it refers to the paragraph in the article that states that plaintiff failed to answer McCallon's letter or pay the least bit of attention to the matter. The matter referred to was the dispensing of liquor in the Moody neighborhood and the demanding an investigation. With the burden on plaintiff to show that he answered the letters or paid attention to the matter, he failed to sustain by a scintilla of proof that he replied to McCallon or that he paid the least attention to an investigation. It is true that he designated Scott Hicks to preserve order among the boys at the church, but there is no evidence as to directing him to make a liquor investigation, the matter the article really complained of.

There is a further averment in the petition that defendant published falsely that plaintiff failed to perform his duties as Sheriff of Howell County in that he had been present at a picnic at Pottersville and there failed to perform his duties as Sheriff of Howell County. We assume that it refers to that portion of the article reading: "At the Odd Fellows picnic at Pottersville recently there were

several drunks on the grounds. An officer from West Plains was present, but made no effort to see if he could find out where the liquor came from." Plaintiff admits that he was at the picnic, and offered evidence to the effect that he was the only officer there to show that it referred to him. The article could in no wise libel plaintiff by stating there were several drunks on the grounds, even if false. The only charge of dereliction of duty, if it was such, was the statement that an officer from West Plains made no effort to see where the liquor came from. Even if the statement impliedly charged that plaintiff failed to make an investigation, it did not *per se* charge a criminal non-feasance and there is neither colloquium . nor innuendo in the petition sufficient to infer a crime as the rules of pleading require (Walsh v. Publishing Co., 250 Mo. 142, 157 S. W. 326). He is not charged with failing to arrest drunks, but at most with failing, when he knew liquor was thereabout, to make an investigation at a certain place. Inferences may be drawn from the statement to the effect, first, that he failed to make an investigation even though he knew liquor was thereabout; second, that even though he did not know it, he should have known it; third, that even though he knew of it, he considered it useless to investigate; fourth, that even though he knew of it, no duty to investigate was cast on him; fifth, that even though he did not know of it, he was not sufficiently discerning to be aware of conditions. Plaintiff offered no evidence to deny the statement that he failed to make an investigation, or deny that he knew liquor was thereabout, but it is impliedly admitted that he did not make one, and he contents himself with denying that he saw any drunks. Even though plaintiff knew liquor was thereabout, and even though there was a duty cast on him to investigate, which latter point we do not decide, inasmuch as different inferences may be drawn from the statement, some of which inferences at least are not libelous *per se*, the rules of pleading required averments in both the colloquium and innuendo tending to show that the statement meant that plaintiff knew that liquor was thereabout, that he was cast with the duty of making and wilfully refused to make an investigation. With the burden on plaintiff to show the falsity of the statements in the article and to show by proper averments the article to be libelous, he has failed to sustain it.

V. In that the article was prima-facie qualifiedly privileged and plaintiff failed to show prima-facie that the article was substantially untrue, it was necessary for plaintiff then to develop express malice to destroy the privilege. However, an orderly disposition of these issues warrants first a discussion of a matter of evidence. It appears that the trial court permitted plaintiff to introduce in evidence to show express malice a newspaper article published by

defendant on October 28, 1920, four years previously. Besides the comment that plaintiff, who was then nominee for sheriff, was a murderer, the article states that upon information from E. M. White, who exhibited to defendant a certified statement from the Circuit Clerk of Ozark County, which was published in full, it was shown in the certified statement that the Ozark Circuit Court records showed that plaintiff in 1894 was charged with murder, convicted by a jury, fined $500, and was later discharged upon payment of costs without paying the fine. Plaintiff also introduced certified copies of the records of Ozark County of the same purport. The article further comments that every gambler, bootlegger, booze fighter and chippy-chaser is fighting Ben Hollingshad for sheriff and boosting the candidacy of Joe Aldridge. They are afraid of Ben Hollingshad and have no fear of Joe Aldridge, that's why. Every man and woman in Howell County knows where Ben Hollingshad stands and he has repeatedly said that he was for strict enforcement of all laws, including booze and gambling laws. Mr. Aldridge has never made a statement that he stands for law enforcement that we have seen.

The salient fact in the referred-to article is that at the time of its publication plaintiff was the nominee of his party for sheriff and consequently waived his right of privacy to the extent of a public inquiry as to his personal conduct in life, and an investigation that then threw light upon his conduct as a man for the benefit of the electorate whose patronage he sought was properly qualified, in the absence of false statement and malice. He thus tendered the issue of his character, qualifications and fitness for the office aspired to. [Walsh v. Publishing Co., 250 Mo. 142, 157 S. W. 326.] As the article was substantially true, it was qualifiedly privileged, even though severe.

Defendant avers the ruling of the Court of Appeals to the effect that the article was admissible to show malice conflicts with the ruling in McClung v. Publishing Co., 279 Mo. 370, 214 S. W. 193, in that other published articles did not tend to show malice, but merely tended to develop a matter of public interest. The crux of the principle involved may be concretely stated to the effect that the conduct of a public official as such was not discussed from an improper motive. The cause and excuse for the publication of the article was not ill-will, spite or the disregard of plaintiff's rights, but was a meeting of the issue tendered as to plaintiff's character and fitness for the office by informing the electorate that a nominee for sheriff, the conservator of the peace, had been charged with murder, convicted by a jury and fined $500. We think the holding of the Court of Appeals conflicts with our ruling in the McClung case and was improperly admitted in evidence because there is no showing that the article emanated from a vicious motive.

VI. The question of express malice remains to be determined, and we must bear in mind that the burden of proof rests upon plaintiff to show it. The article in no wise commented upon the private life of plaintiff. It commented upon him in his official capacity as sheriff only. In Cook v. Publishing Co., 241 Mo. 326, 145 S. W. 480, it is said, "The right to comment on matters of public interest means the right to express opinions as to the acts of a public officer and to draw inferences as to his motives, whether such opinions or inferences are right or wrong, reasonable or unreasonable, provided they are made in good faith and are based upon the truth." We have held that the evidence develops that defendant published the article in good faith and that the evidence fails to develop that it was based on false facts. The evidence tends to show that defendant published matter as an editor, involving a matter of public concern, regarding the public policy of a public official, with reason to believe and believing it true, in which defendant had no personal interest or motive, upon the report of men in whom he had confidence and believed trustworthy. Under these circumstances express malice was not shown.

VII. The opinion of the Court of Appeals holds as follows:
"If a published article directed at a public official is such that it will expose him to public hatred, contempt or ridicule or deprive him of the benefits of public confidence and social intercourse, it is libelous, notwithstanding it may not charge a breach of official duty that by the law is assigned to the officer mentioned or referred to. And this is so because the public generally is not in fact informed as to the exact duties cast by the law upon an officer. The fact that persons learned in the law may know that there has been no breach of duty charged is no antidote to the poison which will affect the minds of the general public. The law is liberal with the press and any fair comment on the conduct of a public officer is qualifiedly privileged, but this privilege has never been extended, and should not be extended, to a license."

We think the opinion misconstrues the effect of the cases, cited by relator as in conflict, in ruling that the article was actionable because it tended to defame plaintiff as a public official, thereby subjecting him to public hatred, contempt or ridicule, or the loss of public confidence and social intercourse. The very purpose in holding a communication, otherwise actionable, qualifiedly privileged is to relieve it of actionability because of the occasion on which it was made. Even though the alleged defamatory article would have been actionable had it not been for the occasion on which it was made, yet the occasion intervening rendered said article qualifiedly

privileged and non-actionable. Inferentially at least the cases cited by relator as in conflict so hold, and in that respect the opinion conflicts with the ruling of this court.

We think the opinion of the Court of Appeals, in holding that alleged defamatory article was not qualifiedly privileged and that plaintiff made a submissible case, conflicted with the general principles in that regard found in the latest cases decided by this court and heretofore cited. Consequently, the record and judgment of the Springfield Court of Appeals should be quashed. It is so ordered. *Higbee* and *Henwood, CC.,* concur.

PER CURIAM:—The foregoing opinion of DAVIS, C., is adopted as the opinion of the court. All of the judges concur; *Blair J.,* in the result.