MAY MERRIAM, Appellant, v. STAR-CHRONICLE PUBLISHING COMPANY, a Corporation.—74 S. W. (2d) 592.

Division One, September 18, 1934.

*Earl M. Pirkey* for appellant.

938

*Green, Henry & Remmers* for respondent.

ATWOOD, P. J.—This is an action for libel in which plaintiff sought judgment for $50,000 actual damages and $50,000 punitive damages. The case was tried to a jury and resulted in a verdict for defendant. From the judgment rendered thereon plaintiff has appealed.

Plaintiff, May Merriam, was superintendent of the House of Detention, or what is known as the Children's Building in St. Louis, Missouri, where neglected and delinquent children were restrained and cared for while awaiting trial or other lawful disposition. Defendant, Star-Chronicle Publishing Company, a corporation, is alleged, in plaintiff's petition upon which the case was tried, to have published five articles forming a connected story concerning said institution and containing certain false, defamatory and libelous articles of and concerning said institution and plaintiff. It is further alleged in plaintiff's petition that "said publications were likely to and did raise the inference and communicated to the public the ideas and statements that the plaintiff was incompetent and unfit to be Superintendent of said Institution and that she was morally unfit to hold said position and to have charge of said Institution and that she had neglected or willfully failed to do her duty in such position and that said Institution was incompetently managed by plaintiff

and that persons who were put in said Home were injured and degraded and ruined or partly ruined morally and that plaintiff was responsible for the same:

"That such publication was likely to and did provoke plaintiff to wrath and expose her to public contempt and ridicule and hatred and gossip and execration and deprive her of the benefit and confidence of others and of social intercourse and said publication was likely to and did greatly damage the good name and reputation of plaintiff and injured her standing and reputation as Superintendent and cause her great mental pain and suffering."

In its answer defendant admits the publication of said articles; specifically denies that they or any of them are false, that they are defamatory or libelous as to plaintiff, that defendant published them on account of any willful or malicious intention to injure plaintiff, that they have damaged plaintiff in any sum or amount whatsoever; and generally "denies each and every other allegation in said amended petition contained."

For further answer and defense defendant alleged that "the articles referred to in plaintiff's petition were parts of a series of articles published by this defendant concerning the St. Louis House of Detention for minor children for the purpose of calling public attention to the unsatisfactory housing conditions at said institution, to its being overcrowded, to the lack of room for proper separation and segregation of the children confined therein, and the insufficient number of adult attendants and guards provided by the city for said institution.

"Defendant further says that said House of Detention is a public institution of the City of St. Louis and the care, character and proper separation and segregation of the poor and unfortunate children confined therein were and are matters of the highest public interest and concern to the people of St. Louis and it was and is the duty of defendant as a public journalist to keep the public informed of conditions existing in said public institution and to urge the correction of bad conditions.

"Defendant further states that prior to the publications complained of four grand juries of the City of St. Louis had made public reports criticizing the overcrowded conditions in said institution, the lack of space for proper segregation, etc., and had recommended the correction of these conditions, and resolutions were then pending in the City Council looking to the correction of said conditions.

"Defendant further says the articles complained of by plaintiff were published by it in good faith, without malice toward plaintiff, for the purpose of calling public attention to said unsatisfactory conditions and obtaining a correction thereof, and said articles were and are therefore privileged in law."

For further answer and defense defendant says that the statements contained in said articles complained of were and are substantially

true, and that taken as a whole, as they should be, the entire series of articles published by defendants are not libelous of plaintiff. Defendant further says that ''said articles are based upon grand jury reports of investigations found by them, reports of Judge Granville Hogan, Judge M. Hartmann and Judge Robert Hall as to conditions at said institution, which reports were relied upon by defendant in making said publications.''

Plaintiff's reply was in the nature of a general denial.

Appellant presents nineteen assignments of error. Respondent replies to each of them but at the same time vigorously insists that its demurrer at the close of the whole case should have been sustained. We shall first consider the court's order overruling this demurrer.

It will be observed that defendant pleaded both qualified privilege and justification in its answer, that is, that the articles complained of related to matters of public interest concerning which it was defendant's duty to keep the public informed and were published in good faith without malice toward plaintiff, and that the statements therein contained and complained of were and are substantially true.

The alleged defamatory matter is thus pleaded in plaintiff's petition:

''That said article published in said paper on June 19, 1929, contains the following false, defamatory and libelous article of and concerning said Institution and plaintiff: to-wit:

''GIRLS OF SIXTEEN DEFY AUTHORITIES TO
MAKE THEM TELL WHO IS RESPONSIBLE
FOR THEIR PLIGHT.

''Tonight, the boy made homeless by abandonment or the divorce court may be forced in that refuge, to share a narrow iron cot, cramped quarters for one restless child, with a vicious young bandit awaiting transfer to the State Reformatory or, if it be a girl, her bed companion for the night may be a dissolute woman of the streets, a petty thief or a hardened shoplifter.

''That said article published in said paper on June 20, 1929, contains the following false, defamatory and libelous article of and concerning said Institution and plaintiff to-wit:·

''Yesterday The Star printed the first article resulting from an investigation by this newspaper of conditions past and present in the home. Evidence was reviewed of the physical and moral vileness of the place, and the inadequacy of the staff in charge.

''Today The Star sheds more light on this subject by presenting the cases of inmates or former inmates within recent years. Here are typical examples of what has gone on in that place which are matters of record:

''Then said article sets out pretended instances of depravity:

''That said article published in said paper on June 21, 1929, con-

tains the following false, defamatory and libelous article of and concerning said Institution and plaintiff to-wit:

"The only bright side to the detention home picture is the effort of the Board of Education to provide some educational, vocational and recreational advantages for the inmates. A staff of teachers under the direction of Miss Bertha Hensel is maintained in the home and the expense is borne by the school fund. These teachers attempt, as best they can, to instill some rudiments of education into the children and to occupy their daylight hours. To offset the lack of segregation facilities, the teachers bring some of the smaller boys from the third to the second floor and put them in classes with the girls. There have been many complaints, however, that the older boys and girls use these little ones as messengers.

"That said article published in said paper on June 22, 1929, contains the following false, defamatory and libelous article of and concerning plaintiff to-wit:

"Because of this great municipality's indifference, young boys and girls are being fed into the maw of corruption and physical suffering there. Negro and white children are herded within a few feet of each other under conditions that the average man would not permit his house dog to endure.

"That said article published in said paper on July 25, 1929, contains the following false, defamatory and libelous article of and concerning plaintiff and said Institution to-wit:

"GIRL TAKEN FROM DETENTION HOME ON HER OWN PLEA.

"GERK AND JUDGE HOGAN ACT BECAUSE OF HER UNDESIRABLE ASSOCIATES.

"Circuit Judge Hogan and Police Chief Gerk have intervened in behalf of a 15-year-old girl who made a personal appeal to them to be removed from the House of Detention because she was forced to associate with older girls of undesirable character. The girl is now being kept in the matron's room at police headquarters.

"The conditions of which the girl told were revealed by The Star in a recent series of articles showing that inadequate housing conditions in the House of Detention have resulted in gross injustice to children who are forced to mingle with hardened characters.

"The girl gave her name as Alma Bates. She was placed in the house Saturday after her uncle, with whom she lived, was arrested on a minor charge.

"Ten minutes after she was placed in a large room with older girls, she ran to the superintendent with a plea to put her elsewhere because she was afraid. The case was presented to Judge Hogan, who handles juvenile cases, and Chief Gerk agreed to let her stay in the matron's room.

" 'I never heard such horrible cursing before in my life,' she told Clerk. 'Those big girls scared me the way they acted.' "

We have already set forth pleaded matters of colloquium.

In Lee v. W. E. Fuetterer Battery & Supplies Co., 23 S. W. (2d) 45, 60, 323 Mo. 1204, we said: "Privileged publications are said to be of two kinds, or classes: (1) Those which are 'absolutely privileged,' and (2) those which are conditionally or 'qualifiedly privileged.' The former term, or classification, has reference to words spoken or written in the course of certain legislative, executive, or judicial proceedings, and such class of privileged publications is not involved in the present action. The latter term, or classification, is defined as 'a publication made on an occasion which furnishes a prima facie legal excuse for the making of it; and which is privileged, unless some additional fact is shown which so alters the character of the occasion as to prevent it furnishing a legal excuse.' [Townshend on Slander & Libel (4 Ed.), sec. 209.]"

Appellant says that the articles "were not privileged because they did not purport to be a report of a public proceeding but the articles were a series of magazine articles on the House of Detention." Notwithstanding the articles quoted grand jury reports and other official investigation they also contained other matter because of which they might not be cons dered "absolutely privileged," but the reason assigned obviously d es not preclude the possibility that they were "qualifiedly privileged."

Appellant also say that the "necessary steps for improving the House of Detention nd the necessary appropriations were about completed when the Star started these articles," so that the occasion necessary to make these articles "qualifiedly privileged" did not exist. However, the record discloses that all of the alleged libels except the last one were published before the ordinance authorizing the appropriations was approved by the mayor on July 9, 1929, and this last publication only referred to articles previously published and related and incidents shown to be substantially true from plaintiff's own evidence. Moreover, the entire series of articles was preceded by several grand jury reports and other official investigations, which had been made public, sharply criticising conditions at the institution. We think the occasion necessary to make these articles qualifiedly privileged existed and that they were qualifiedly privileged. [State ex rel. Zorn v. Cox, 318 Mo. 112, 118, 298 S. W. 837, 840; Lee v. W. E. Fuetterer Battery & Supplies Co., 323 Mo. 1204, 23 S. W. (2d) 45, 61; McClung v. Pulitzer Pub. Co., 279 Mo. 370, 398, 399, 214 S. W. 193; Diener v. Star-Chronicle Publishing Co., 230 Mo. 613, 132 S. W. 1143.]

The rule as to proof in libel cases where the defense pleaded include

qualified privilege is thus stated in Cook v. Pulitzer Publishing Company, 241 Mo. 326, 363, 145 S. W. 480:

"We think the rule to be deduced from the authorities and in accord with the better reason, is that when a defense of privileged comment on a matter of public interest is presented by the issues, the plaintiff may overcome the privilege pleaded either by proof that the publication was inspired by actual malice, or that the facts published and commented upon were false. If he fail to prove the one or the other a prima facie case will not be made out, and the court, upon the request of the defendant, should give an instruction in the nature of a demurrer to the evidence. These two grounds of attack upon the privilege pleaded are available to the plaintiff in all cases, for in publications commenting upon matters of public interest, facts are always present, stated either expressly or by necessary implication." [Also, see McClung v. Star Chronicle Publishing Co., 274 Mo. 194, 202 S. W. 571; McClung v. Pulitzer Pub. Co., 279 Mo. 370, 400, 214 S. W. 193.]

█ Apparently conceding that plaintiff has the burden of proving express malice (Cornelius v. Cornelius, 233 Mo. 1, 30, 135 S. W. 65; McClung v. Pulitzer Pub. Co., 279 Mo. 370, 403, 214 S. W. 193; State ex. rel. Zorn v. Cox, 318 Mo. 112, 298 S. W. 837, 841), appellant passes the matter by with this assertion: "The malice of the defendant was shown by the numerous untruthful statements and the overdrawing of matters of fact which occurred in its articles and by the fact that although one of the Grand Jury reports said: 'the investigation disclosed that a great service is being rendered by this institution despite its physical handicaps.'" This assertion will be considered in connection with plaintiff's evidence as to the falsity of these articles, to which we now turn.

Plaintiff was examined at length as to the falsity of the alleged libelous parts of defendant's publications, and their context as well. She was asked if the following statement, quoted in the petition from defendant's article dated June 19, 1929, and hereinabove set forth, was true:

"Tonight, the boy made homeless by abandonment or the divorce court may be forced in that refuge, to share a narrow iron cot, cramped quarters with one restless child, with a vicious young bandit awaiting transfer to the State Reformatory; or, if it be a girl, her bed companion for the night may be a dissolute woman of the streets, a petty thief or a hardened shoplifter."

She replied that it was "not correct because the beds are adequate for one restless child and the girls are never put with hardened women of the streets—never have been." However, this statement must be read in connection with others made in the course of her examination. Elsewhere she said that "some very young children are

called bandits—brought in as bandits. We have been crowded and had to put two beds together and have three boys sleep that way.'' When asked if she had ever put two in one narrow iron cot just big enough for one, she replied: ''Only the smaller boys as a rule. We have sometimes put two in one cot, one child slept one way and the other the other, on the regular regulation beds, regular institution beds about three and a half feet wide, large enough for one child.'' Asked if she had ever put one of the children known to be a hardened criminal with a younger child, she said: ''We have always tried to the best of our ability to keep the smaller children away from the others, especially at night. We have always put the older ones together, as far as possible.'' Nevertheless, she admitted that while they could conveniently handle sixty, many times they were confronted with the situation of trying to accommodate eighty or more inmates, sometimes exceeding one hundred. She also said that because of circumstances there were many times when homeless and abandoned children would be kept at this institution; that they had two rooms for girls and for little innocent children. ''In the larger room there are all the way from three to sixteen girls, all classed as delinquents, incorrigibles, most of them charged with immorality. There would be other girls in there not charged with immorality, if we get shoplifters their record usually shows they have been immoral; if we get little girl shoplifters their first time, we generally find it out right away and we always keep them separated if it is a physical possibility.'' It will be observed that the above-quoted published article does not purport to be a statement of past occurrences. From the foregoing admissions of plaintiff and other conceded facts as to then existing inadequate facilities and insufficient help, it seems apparent that the possibilities stated in this article were well within the range of probability and that plaintiff failed to carry the burden of showing they were untrue.

In the part of defendant's publication of June 20, 1929, pleaded as libelous, reference is made to the previous article as containing a review ''of the physical and moral vileness of the place and the inadequacy of the staff in charge.'' Questioned as to these conditions, plaintiff said that ''some of the children come in terribly dirty and their heads are sometimes filled with vermin;'' that she was not provided with ''a room or any sort of place where we can keep them separated to clean them up before we tie their heads up;'' that they put blue ointment on their heads and they even went to school with their heads tied up; that she had learned ''that children left the place with lice or vermin upon them, because they come there and go at all hours;'' that vice and vermin are a problem; that sodomy was practiced among the boys and she ''had more than one report that boys practiced sodomy with their mouths among the older boys;''

that older boys and trusties by persuasion or coercion induced younger boys to engage in these immoral practices; that "the girls are more immoral, appear to be more immoral than the boys;" that "it might be true that with the facilities there, innocent little children are thrown among foul ones and they say and do things that they didn't know before;" that "it could be true that the scar of what is learned or saw will stay with that child;" that she had complaints for years of deliberate exposure of the privates by both boys and girls; that stools were placed in the boys rooms with no screen or any privacy whatever; that they had no laundry; that profanity was frequent; that the white children being placed at one end of the building and the colored children at the other, it was impossible to adequately supervise such a situation with one man; that "in all these years the City has seen fit to allow but one cook;" that the institution needed "better segregation of the children as to age, sex and color;" that "the neglected children held for the Board of Children's Guardians should be separated from those held for some delinquency or criminal offense." In fact, it was generally conceded that the conditions were deplorable, and plaintiff said that for a number of years she had "been trying to correct the deplorable conditions in that Home."

Among instances cited in this article was "the story of a boy who became frightfully diseased while confined there." Plaintiff said that this referred to Mike Sodoma, but that "he didn't get the disease the other boy had." When asked whether there was not "one boy in the home who had syphillis and another boy in the place who had gonorrhea, and both practiced sodomy on this Sodoma boy," she said: "I cannot tell you that. . . . The complaint that Mike Sodoma contracted the disease at the institution was made; boys are very unreliable." Plaintiff was questioned as to other instances cited in this article. Some of them she admitted were true and others she said were incorrect, although from her evidence as a whole it appears that even in the latter cases reports were current substantially as stated in the published articles and defendant had reasonable cause to believe they were true. Again we say that plaintiff failed to carry the burden of proving that alleged libelous matter in this article was not substantially true.

Questioned as to the paragraph heretofore quoted from defendant's publication of June 21, 1929, plaintiff said: "There isn't any of it true—the teachers do that—the teachers do their share, but there are many things that are done to make it a bright spot. That part that a staff of teachers under the direction of Miss Bertha Hensel is maintained in the home and the expense is borne by the school fund is correct, and that 'the teachers attempt, as best they can, to instill some rudiments of education into the children and to occupy their daylight hours,' that is true. It is also true that the teachers

bring some of the smaller boys from the third to the second floor and put them in classes with the girls. The statement, 'there have been many complaints, however, that the older boys and girls use these little ones as messengers,' has been true; not any more, because we have watched them more carefully than in other schools, but it has happened.'' The point of plaintiff's criticism seems to be that there was another bright side to the detention home picture which defendant failed to present, but just what it was is not clear from the evidence.

We have already reviewed conditions disclosed by plaintiff's evidence from which it reasonably appears that the alleged libelous matter heretofore quoted from defendant's publication of June 22, 1929, was substantially true. Moreover, we find nothing in plaintiff's evidence showing falsity of the matter heretofore quoted from defendant's publication of July 25, 1929, which is the last article pleaded as libelous in plaintiff's petition.

Recurring to appellant's claim that malice on the part of defendant was shown, we think upon the whole record it is groundless. Had the deplorable conditions then existing been less graphically portrayed it is probable that the articles would have lacked pith and vigor necessary to fix the public mind upon the evils sought to be corrected.

The publications in question being qualifiedly privileged and plaintiff having failed to show their falsity or the presence of malice on the part of defendant, it follows that plaintiff made no case for the jury and the trial court should have sustained defendant's demurrer submitted at the close of the whole case. [Diener v. Star-Chronicle Publishing Co., 230 Mo. 613, 621, 132 S. W. 1143; Tilles v. Pulitzer Publishing Co., 241 Mo. 609, 647, 145 S. W. 1143; Cook v. Pulitzer Publishing Co., 241 Mo. 326, 363, 145 S. W. 480; Lee v. W. E. Fuetterer Battery & Supplies Co., 323. Mo. 1204, 23 S. W. (2d) 45, 63.]

Inasmuch as defendant's demurrer to the evidence should have been sustained alleged errors prejudicial to plaintiff are immaterial. [Tilles and Cook cases last above cited; McClung v. Pulitzer Publishing Co., 279 Mo. 370, 214 S. W. 193; State ex rel. Zorn v. Cox, 318 Mo. 112, 298 S. W. 837; Giles v. Michigan Central Railroad Co., 278 Mo. 350, 212 S. W. 873.]

For the reasons above stated, the judgment is affirmed. All concur.