Joe W. MANNING, Plaintiff-Respondent,

v.

Robert G. McALLISTER and William R. Yinger, Defendants-Appellants.

No. 32977.

St. Louis Court of Appeals, Missouri.

April 28, 1970.

McMahon, Kieffer & Schmidt, Clayton, for defendants-appellants.

Robert I. Neuman, Overland, Jerome M. Steiner, Clayton, for plaintiff-respondent.

DOERNER, Commissioner.

In this action for slander plaintiff recovered a verdict and judgment for $4,000, from which the defendants appealed.

On December 17, 1964, plaintiff was a probationary patrolman in the Police Department of the Village of St. John in St. Louis County, and the defendants McAllister and Yinger were the Chief of Police and the Sergeant, respectively, of that Department. Relying in the main on information which an informant, Neal or Nellum Smith, had furnished to the defendants, McAllister discharged plaintiff on that day on the grounds that plaintiff was guilty of conduct unbecoming an officer by associating with known felons to commit burglaries within the Village of St. John. Two or three days later Bond Ray, plaintiff's father-in-law, conferred with the defendants, his objective being, as he expressed it, because he " * * * wanted to find out just exactly what they were —what they had that they fired this boy for and the reason. I tried to just find out all the information that I could." In response to his inquiries both defendants informed him that plaintiff was guilty of conduct unbecoming an officer for conspiring with burglars and for associating with known felons to commit burglaries within the Village. Miss Janice Ray, the daughter of Bond Ray and plaintiff's sister-in-law, who was the secretary to the Village's Police Board, handed in her resignation to McAllister about the same time and inquired of him why he had discharged the plaintiff. Miss Ray testified that McAllister told her plaintiff had been dismissed due to association with known felons in the Village for the purpose of committing crimes or burglaries. McAllister denied that he had so informed Miss Ray, and stated that when she asked him the reason plaintiff had been discharged he suggested that she consult her father. Since the plaintiff prevailed we must, of course, accept the evidence in the light most favorable to plaintiff.

 The principal issue presented by defendants, inherent in their first three points, is whether their defamatory utterances were qualifiedly privileged communications. Their first point is that, "The

Trial Court Errored (sic) in Not Finding as a Matter of Law That the Communications Made by the Defendants to the Plaintiff's Relatives Were Privileged Communications." Assuming for the moment that defendants' communications were qualifiedly privileged (a valid assumption, as will shortly appear), in what manner should the trial court have made such a declaration? Defendants do not state in their point, but in the argument portion which follows they argue that, " * * * the defendants' motion at the conclusion of plaintiff's case should have been granted. * * *" We agree, but the fatal weakness in defendants' present position is that when the trial court overruled their motion for a directed verdict at the close of plaintiff's case they waived their motion by presenting evidence thereafter. Polovich v. Sayers, Mo., 412 S.W.2d 436; Appelhans v. Goldman, Mo., 349 S.W.2d 204; Snead v. Sentlinger, Mo., 327 S.W. 2d 202. Furthermore, since defendants did not file a motion for a directed verdict at the close of all the evidence they are in no position to now claim that the court erred in submitting the case to the jury. Millar v. Berg, Mo., 316 S.W.2d 499; Heideman v. Lorenz, Mo., 349 S.W.2d 230. And defendants make no request for review under the plain error rule. Civil Rule 79.04, V.A.M.R.; Heideman, supra; Millar, supra.

■ In their next point defendants urge that, "The Court Errored (sic) in Failing to Instruct the Jury on the Defense of Privilege as Asserted by the Defendants." The instruction offered by the defendants and refused by the court in effect submitted to the jury the question of whether or not the communications were qualifiedly privileged. In the absence of any controversy as to the character of the surrounding circumstances and relationship, as in this case, the question of whether a communication was qualifiedly privileged was one of law, to be determined by the court and not by the jury. Hellesen v. Knaus Truck Lines, Mo., 370 S.W.2d

341; Fisher v. Myers, 339 Mo. 1196, 100 S.W.2d 551; Lee v. W. E. Fuetterer Battery & Supplies Co., 323 Mo. 1204, 23 S.W. 2d 45. Accordingly, the court did not err in refusing the defendants' instruction.

■ The defendants, however, are on firmer ground in their complaint regarding the giving of Instruction No. 5, offered by plaintiff. In substance the jury was told by that instruction that it might infer that the utterances were maliciously made if they were slanderous and false, and if plaintiff was defamed and injured by their publication. As stated in Pulliam v. Bond, Mo., 406 S.W.2d 635, 641: " * * The rule is recognized in Missouri as well as elsewhere that the existence of a conditional or qualified privilege precludes an inference of malice from the communication of false and defamatory matter and the plaintiff has the burden of proving express malice. See: Hellesen v. Knaus Truck Lines, Mo., 370 S.W.2d 341, 345 [9], State ex rel. Zorn v. Cox, 318 Mo. 112, 298 S.W. 837, 839 [2], Kleinschmidt v. Johnson, Mo., 183 S.W.2d 82, 84 [3, 4], Cook v. Pulitzer Publishing Co., 241 Mo. 326, 145 S.W. 480, 490 [16], * * *." It follows that if the communications made by defendants were qualifiedly privileged the court erred in giving Instruction No. 5.

Thus, by this somewhat circuitous route, we reach the principal issue which divides the parties. Defendants maintain that the defamatory statements, made to plaintiff's relatives, which were not volunteered and were spoken only in response to the inquiries of such relatives as to the reasons why defendants had discharged plaintiff, were qualifiedly privileged communications. Plaintiff argues to the contrary, and cites Harbison v. Chicago, R. I. & P. Ry. Co., 327 Mo. 440, 37 S.W.2d 609, 79 A.L.R. 1, in support of his contention that statements to a relative are not privileged. That case, however, merely holds that a statement defaming a husband, made in the presence of the wife, is a publication of the statement, and the question of priv-

ilege was not considered or discussed. In Hellesen v. Knaus Truck Lines, Mo., 370 S.W.2d 341, 345, it was said that, " 'A communication is held to be qualifiedly privileged when it is made in good faith upon any subject-matter in which the person making the communication has an interest or in reference to which he has a duty, and to a person having a corresponding interest or duty, although it contains matter which, without such privilege, would be actionable. * * * ' " A somewhat longer definition is found in Garey v. Jackson, 197 Mo.App. 217, 193 S.W. 920, 922: "It is the law in this state that before the defense of qualified privilege is available it must appear that the statements made by the defendant were made in the discharge of some duty, either public or private, either legal, moral, or social, to a person or persons having a corresponding interest or duty, and were spoken in connection with and were relevant and germane to some matter involving such an interest or duty, and that the words were spoken in the interest of or for the protection thereof. In addition they must have been uttered in good faith and spoken on a proper occasion, from a proper motive and based upon a probable cause, and in the honest belief that such statements were true. * * * " Our Missouri reports are replete with many and varied examples of qualifiedly privileged communications. A warning letter by an employer to his employee charging him with dishonesty, a copy of which was sent to the employee's union in accordance with the applicable union contract, Hellesen v. Knaus Truck Lines, Mo., 370 S.W.2d 341; a letter by a client to a Bar association claiming that his lawyer had double-crossed him, Lee v. W. E. Fuetterer, 323 Mo. 1204, 23 S.W.2d 45; a letter caused to be published in a newspaper, answering one inserted by plaintiff, a law professor who had been discharged, in which fellow law professors stated plaintiff was unfit to continue as a member of the faculty, Clark v. McBaine, 299 Mo. 77, 252 S.W. 428; Clark v. Hill, Mo., 252 S.W. 433; statements by

an employer to a suspended employee that he had made crooked deals, and was a liar and a cheat, made in the presence of the employee's wife, Rauch v. Gas Service Co., Mo.App., 235 S.W.2d 420; a statement by a store detective to an employee, made in the hearing of others, that the employee had stolen the coat of a fellow employee, Perdue v. Montgomery Ward & Co., 341 Mo. 252, 107 S.W.2d 12; a statement by the company's president to the employees' shop committee that the employee was a thief and a damned crook and liar, Boehm v. Western Leather Clothing Co., Mo.App., 161 S.W.2d 710; a speech by the president of a student co-operative bookstore in which he charged the plaintiff, the former manager and currently the owner of a competing bookstore, with having taken a quantity of second hand books when he resigned, and with being a shrewd and unscrupulous competitor, Garey v. Jackson, 197 Mo.App. 217, 193 S.W. 920.

While the foregoing Missouri decisions reveal a wide variety of factual situations in which the defamatory statements have been held to have been made on privileged occasions, none has been cited or found by us where, as here, the statements were made in response to inquiries by relatives of the party defamed. But the weight of authority, according to the text writers and the cases from other jurisdictions, is that, " * * * A communication to the relatives of a party defamed, when made on request or in the discharge of a duty, social, moral, or legal, is qualifiedly privileged. * * * " 53 C.J.S. Libel and Slander § 120, p. 197. And see Restatement of the Law of Torts, § 597 and 33 Amer.Jur., Libel and Slander, § 130, p. 128. In Conner v. Taylor, 233 Ky. 706, 26 S.W.2d 561, defendant, the owner of a dairy farm, who had been operating the farm on shares with the plaintiff, refused to allow the plaintiff to return to the farm after learning that plaintiff's illness had been caused by a venereal disease. Plaintiff's brother-in-law conferred with the defendant and

asked the latter why he had dispossessed the plaintiff. Defendant told the brother-in-law that plaintiff was afflicted with a venereal disease and that his other employees wouldn't stay on the farm with plaintiff. The court held that the defendant and the brother-in-law had a corresponding interest in the subject of the plaintiff's employment, and that the defamatory statement, made in response to the brother-in-law's inquiry, was qualifiedly privileged.

An even closer case on the facts is Faber v. Byrle, 171 Kan. 38, 229 P.2d 718, where plaintiff brought an action for slander in two counts. In the first he alleged that the defendant had stated to a sheriff's investigator, and in the second to plaintiff's half-brother, that defendant had discovered the plaintiff and the plaintiff's hired man in the act of stealing gasoline, and that plaintiff had forced defendant into a chair at gunpoint, tied him up, and threatened him if he told of the incident. The court held the defamatory statements made both to the investigator and the half-brother were qualifiedly privileged communications, and emphasized that that made to the half-brother had been made in the interests of the family welfare. In Ebaugh v. Miller, 127 Kan. 464, 274 P. 251, having learned of a questionable association between the plaintiff, a school teacher, and a minister, a school board did not renew her contract. Each having heard rumors about the matter, plaintiff's brother, her husband's cousin, and a fellow minister, separately inquired of defendant, a member of the school board, as to the reason the board had not renewed plaintiff's contract. On each occasion defendant informed them of what he had been told regarding plaintiff's conduct. It was held that in each case the statements were qualifiedly privileged communications. In Long v. Peters, 47 Iowa 239, plaintiff's mother asked the defendant for the facts relative to the disappearance of defendant's hairbrush, and defendant replied that the plaintiff had stolen it. The court held that the

mother and the defendant had a corresponding interest concerning plaintiff's action, and that the communication to the mother was qualifiedly privileged. In Brow v. Hathaway, 13 Allen (95 Mass.) 239, defendant, a storekeeper, suspecting that plaintiff, his employee, had stolen goods from him, in company with a police officer, called at the home of plaintiff and her mother, and when the mother inquired what they wanted, the defendant replied that they wanted to search the house because plaintiff had stolen goods from him.

All of the foregoing cases involve a factual situation in which the defamatory statements were made in response to an inquiry of a relative of the person defamed, and were held to have been qualifiedly privileged because of the mutual and corresponding interest of the speaker and the relative. There are, in addition, many cases which hold that the defamatory communications were qualifiedly privileged, even though voluntarily made, if the defendant had an interest in the person defamed and owed a moral duty to the recipient. For example, in Baskett v. Crossfield, 190 Ky. 751, 228 S.W. 673, the plaintiff was dismissed from a college because of indecent exposure. The defendant, president of the college, wrote to plaintiff's father to advise the latter of the reason for the plaintiff's dismissal, and it was held that the communication was qualifiedly privileged. See also Kenney v. Gurley, 208 Ala. 623, 95 So. 34; Livingston v. Bradford, 115 Mich. 140, 73 N.W. 135; Fresh v. Cutter, 73 Md. 87, 20 A. 774; Zanley v. Hyde, 208 Mich. 96, 175 N.W. 261; Western Union Telegraph Co. v. Buchanan, Tex.Civ.App., 248 S.W. 68; Moore v. Butler, 48 N.H. 161.

Of course, not every communication made to a relative is qualifiedly privileged. And as pointed out in the cases, it is the surrounding circumstances as they appeared to the defendant at the time of the utterance of the words that the court

considers in determining the question of privilege. Holmes v. Royal Fraternal Union, 222 Mo. 556, 121 S.W. 100; Garey v. Jackson, 197 Mo.App. 217, 193 S.W. 920. In the instant case defendants were aware of the family relationship between plaintiff and the Rays, and plaintiff's own evidence showed that their relationship had been very close. The father-in-law stated that he had helped the plaintiff financially when the plaintiff went through bankruptcy in 1961 or 1962, their homes were only half a block apart, and shortly after the plaintiff was discharged plaintiff and his family went to live with his father-in-law and sister-in-law. Plaintiff concedes that the statements made by the defendants were not volunteered, and his own evidence shows that they were made only after Mr. Ray and Miss Ray had asked defendants why the plaintiff had been discharged. The replies of the defendants were made in the privacy of McAllister's office, with no third person present, and were made in good faith and without any actual malice. The Rays and the defendants had a mutual and corresponding interest in the matter of plaintiff's discharge, and taking into account the facts and circumstances surrounding the communications in question, as well as the authorities discussed, the conclusion is inescapable that they were qualifiedly privileged.

■ However, while we hold that the communications were made on privileged occasions, because of the manner in which that question was properly presented we may not reverse the judgment outright, and are limited to reversing and remanding for a new trial, should the plaintiff be so inclined. For that reason we should consider defendants' final point, that the court erred in admitting plaintiff's Exhibit 1, an article which appeared in the St. Louis Post-Dispatch.

In his petition plaintiff, after setting forth the statements attributed to defendants, alleged: " * * * that said words, as spoken above, and in variation have been repeated and have been imprinted in the newspapers of the St. Louis metropolitan area; * * *." During the trial plaintiff's Exhibit 1 was identified by Mr. Ray as an article which appeared in the St. Louis Post-Dispatch on December 31, 1964, and Exhibit 2 as one which appeared in the St. Louis Globe-Democrat, but the court reserved its ruling on their admissibility. During his cross-examination McAllister stated that a man named Bell from the Post-Dispatch called him and asked him if it wasn't true that plaintiff had been suspended and subsequently fired. McAllister stated that he asked Bell where Bell had obtained the information, and Bell replied that he had it and all he wanted was a confirmation. McAllister then confirmed that plaintiff had been dismissed, and when Bell asked if it was not for the same reason that an officer named Davis had been dismissed earlier, McAllister also confirmed that. Also in cross-examination McAllister said he had received a call from the Globe and he had confirmed it to the Globe also. Still on cross-examination, McAllister was asked who in the Village normally made newspaper releases, and answered that the Village Clerk did. At the close of all the evidence the plaintiff again offered Exhibits 1 and 2, defendants' objections were renewed, and the court stated that for the present he was reserving his ruling. The record indicates that during a recess the forms of verdict were agreed upon and the instructions submitted by the parties were discussed and objections thereto made. When the trial was reconvened the court ruled that Exhibit 1 would be admitted into evidence and Exhibit 2 excluded, and Exhibit 1 was then passed among the jurors. Exhibit 1 read as follows:

"OFFICER FIRED: FRIENDSHIP WITH BURGLARS CHARGED

"Probationary Patrolman Joseph Manning of St. John has been dismissed for allegedly associating with burglars, Chief of Police Robert McAllister said today. The dismissal was effective Dec. 15.

"McAllister said Manning's name came up in the investigation of another former St. John officer, Bob A. Davis, who was discharged Dec. 1 for allegedly aiding burglars in planning their jobs. Manning, a former Fenton and Florissant policeman, was with the St. John department for about five months."

McAllister categorically denied that he had made the statement attributed to him in the article and insisted that when asked by Bell he had merely confirmed the fact of plaintiff's dismissal.

■ ■ So far as defendant Yinger is concerned it is clear that the court erred in admitting Exhibit 1 into evidence because there was not a scintilla of evidence that connected him in any way with the preparation, confirmation, or publication of the article in question and the admissibility of the exhibit was not limited to McAllister. As to the latter, the only claim of error stated in defendants' brief is that, " * * * the introduction into evidence of the article as appearing in the Post-Dispatch was contrary to the rules of evidence and denied the defendants of their basic rights as set out in the law. * * *" Such a contention is a far cry from the requirements of Civil Rule 83.05 (e), V.A.M.R., and this court will not assume the burden of speculating as to which "rules of evidence" and what "basic rights as set out in the law" the defendants had in mind.

For the reasons stated the judgment is reversed and the cause is remanded for a new trial.

PER CURIAM:

The foregoing opinion by DOERNER, C., is adopted as the opinion of this court. Accordingly, judgment reversed and cause remanded for new trial.

WOLFE, P. J., and BRADY and DOWD, JJ., concur.