JOHN A. LOGAN WARREN v. PULITZER PUBLISHING COMPANY, a Corporation, Appellant.—78 S. W. (2d) 404.

Division One, December 21, 1934.

*Green, Henry & Remmers* for appellant.

*Earl M. Pirkey, Knight & Lupton* and *Gus S. Brown* for respondent.

HYDE, C.—This is an action for damages for publishing an article in the St. Louis Post-Dispatch alleged to have been "false, damatory, and libelous" and "wilfully, intentionally, wrongfully, wantonly and maliciously printed and published in said newspaper." Plaintiff recovered a verdict for $10,000 actual and $15,000 punitive damages. The trial court ordered a *remittitur* of $5,000, from the amount assessed as actual damages and $10,000 from the amount assessed as punitive damages. This *remittitur* was made and judgment was entered for $5000 actual damages and $5000 punitive damages. Defendant has appealed from this judgment.

Plaintiff's petition alleged:

"That plaintiff was . . . a minister of the Gospel laboring as such at his calling in Winnebago County, Illinois," and "that said publication was likely to and did raise the inference and communicated to the public the ideas and statements that the plaintiff had seduced Hazel Lamb and that he had had sexual intercourse with her by force and that he had attempted to have sexual intercourse with her by force and that he repeatedly had sexual intercourse with her and that he had enticed her to come to him out into the dark for improper purposes and that he was untrue to his wife and that he hated old women and would not speak to them and that he was unfit to be a minister of the Gospel and that he was immoral and unchaste and that he was a hypocrite and a libertine and that he was dishonest."

Defendant's answer admitted the publication, denied that it was false, defamatory or libelous; alleged that the statements in the article concerning plaintiff were true; but that defendant refrained from publishing anything about plaintiff until after he had been tried by, found guilty and expelled from the church; stated that the article was a fair account of the church trials of plaintiff, which were matters of great public interest; alleged that the article was published in good faith, without knowledge of falsity, without malice, and was therefore privileged in law; and also alleged that Chicago and other Illinois papers had published similar articles prior to this publication. The answer also alleged that plaintiff's reputation was bad before defendant's article was published.

Plaintiff's reply denied the allegations of the answer "except that a committee of a body known as the Rock River Conference heard charges against plaintiff, and that a majority of said committee passed a resolution forbidding him to act as a minister of the Methodist Church." The reply further alleged:

"The proceedings of said Rock River Conference with reference to plaintiff were not proceedings in good faith, but were irregular and fraudulent proceedings, and were conducted and carried through

by members who formed said majority of said committee of said Conference, and by other members of said Conference, who knew that said charges were false, but irregularly and fraudulently rendered and caused to be rendered said resolution of expulsion, and this action and the hearing were originated and controlled and dictated by said opponents and personal enemies of plaintiff, . . . and plaintiff's appeal was dismissed without his knowledge and consent . . . by the wrongful acts of his chief counsel . . . induced to take such action by threats and persuasion and misrepresentation of said opponents and personal enemies.''

The article, complained of, was published as a full page of the magazine section of the Sunday Post-Dispatch on November 13, 1927, with pictures below the headlines of plaintiff, his wife, Hazel Lamb, and the Durand Church, and also a drawing showing a girl, with bowed head, entering a darkened doorway in which the faint outlines of a man appear. The headlines of the article were, as follows:

"*The Way of a Minister With a Housemaid*" (in large letters).

"She Couldn't Resist His Eyes, So Durand (Illinois) Pastor is Now Out of a Pulpit and Is Suing Six Members of His Flock for Slander" (in bold type but smaller letters).

The article below these headlines and pictures was separated into nine paragraphs which are so numbered in this opinion, for convenience in reference thereto, to-wit:

(1) "*A sprightly young Methodist minister was the Rev. John A. Logan Warren, and he had a roving eye and a disposition to be friendly. Especially, he liked the ladies, and the younger ones.* The elder female members of his flock found him not quite so amiable. A good many said he high-hatted them. Sometimes when they met him on the street he would pass right on, looking past them as if absorbed in mighty problems, and even after services, when he stood at the door shaking hands, *he was not quite the sort of pastor the elder sisters admire* and find most comforting in the dullness of a small town like Durand.

"*But in spite of these traits,* unfortunate as they were in a village where much depends on the feelings of the elder sisters, the Rev. Mr. Warren was achieving a fair degree of success as pastor of the Durand Methodist Episcopal Church. Some who defended him said he was intellectually superior to his congregation and that his opponents merely couldn't understand him. Anyway, if he wasn't so sympathetic as he might have been, he was businesslike, and his collections were larger than collections had ever been before his arrival. In a little more than a year he had completed the building of a new $80,000 church to replace the one destroyed by fire two years earlier, and with all his high-hatting he had brought about a lively increase in attendance. Of excellent standing in the Rock River Conference,

he was almost 'made' as a minister, almost ready for promotion to a big-town pulpit.

(2) "Then suddenly the Rev. John Logan Warren found himself in trouble—*the worst mess a minister of the gospel had got himself into since the fictional Elmer Gantry's affair* with Lulu Bains down at Schoenheim. *It was 'girl trouble,' very similar to Elmer's,* and in this case considerably more disastrous. That was last January.

"Without further chronicle of the steps in his downfall at this point, it may be stated that the Rev. Mr. Warren no longer is a minister. After several months of gossip, charges, counter charges, slander suits and church hearings, he was unfrocked not long ago when a Rock River Conference trial board of 15 ministers heard his case at the Conference meeting at Oak Park, a suburb of Chicago. Found guilty of unbecoming conduct (which really was only a euphemism), he was not only deprived of ministerial standing, but also cast out of the Methodist Church.

"He is selling insurance in Rockford now, and *Durand is discussing what will happen if he ever shows his face there again.* It has been discussing the scandal or some of its ramifications ever since last winter, and the story seems destined to at least a neighborhood immortality. It may be that some of the very young children in Durand will outlive the tale of Pastor Warren's indiscretions, but that is doubtful.

(3) "So far as the townspeople can remember now, the morning of last January 14 was a very quiet morning, as most mornings are in Durand. That is, *it was quiet up to a certain time. About 8 A. M., it seems, Mrs. Warren came downstairs a little more quietly than usual and went softly to the kitchen. There stood her husband with both arms around the housemaid.* The maid saw her and broke away, but Warren didn't see her and followed the maid across the room. *The first intimation he had of his wife's presence was when she screamed and let fly at him with a stove shaker.* It caught him plump on the back of the head and laid open his scalp. Then she screamed again and the maid screamed and fled and *there was so much commotion that the neighbors came running out to see what the excitement was about.* Observing it was a family fight, they went about their own business without much important information as to details, but *details were not lacking very long.*

"Hazel Lamb, the housemaid, became frightened. *She was only 19 years old and inexperienced in armours with pastors,* or anybody else, for that matter. The neighbors say now that she always was a stay-at-home, who never even had a date like other girls, although she was possessed of a certain beauty. She had been graduated from the community high school the spring before and, last fall, finding other employment scarce in Durand, went to help with the housework at the parsonage. Her father, who was a janitor at the Meth-

odist Church, said he thought she would be better protected there than if she left home and sought work in Rockford, which is 20 miles away and as wicked as most cities of its size.

"Hazel was almost in hysteria when she came running home from the parsonage that January morning, and after she had calmed down a bit she told her mother the whole story. Her mother told the girl's father and the father told the church board, and before long the whole town had it and was being shocked as Durand never had been shocked before.

(4) "The surprising of the pair by Mrs. Warren and the ensuing kitchen combat had been only the closing episode of an extended affair of intrigue, according to the girl's account. Months before that she had fallen victim to the dapper pastor's charms. She had been hypnotized, she said. She had tried to resist, but he had always compelled her to look him in the eye, and when she looked him in the eye she was powerless, because his eyes fascinated her. There had been a lot of meetings with him, she said. More than once, after a blazing denunciation of sin, he had hastened from the pulpit to keep a tryst with her in his own home, almost under the eyes of his wife. Sometimes he lingered behind when Mrs. Warren went downtown shopping or out to visit the neighbors. And once when Mrs. Warren was out of town the two had spent the nights together in the parsonage.

(5) "When Durand had heard this story it was frankly stumped. Never before had the Methodist Church had such a situation to deal with. Members and church officials debated heatedly about what should be done, but several weeks passed before anything definite was done. In the meantime church and Sunday school attendance fell off until it was hardly worth while to keep the church open. The Methodist congregation found in this circumstance a bitter pill of irony. Here they had just spent $80,000 to build one of the finest small-town churches in Northern Illinois, and then within six months after its dedication were ashamed to be seen in it because of the conduct of their pastor. Mrs. Sylvia Sodamon flatly refused to continue teaching her Sunday school class and several other teachers followed her example.

"Mrs. Warren, who at first was reported to be planning a divorce action, came to the pastor's support and did her best to save the situation by visiting the members, and Pastor Warren became unusually cordial with everybody, but still the scandal could not be talked down. Finally, the district superintendent, the Rev. C. K. Carpenter of Baileyville, came to town and the church board laid the matter before him. They urged the superintendent to remove Warren at once, and Hazel Lamb's father formally entered charges against the minister.

"The Rev. Mr. Carpenter told them the case was entirely too serious to permit any summary action on his part and that he would have to

see the Bishop. A few days later he did confer with Bishop Edwin Holt Hughes, and it was decided to call on the Rev. Mr. Warren for an explanation. Warren was then apprised of the charges and asked what he was going to do about them. He said he was going to do plenty. It was all a frame-up on the part of political enemies who had opposed his candidacy for Congress in the last campaign, he declared, and he was going to hire a lawyer to go to the bottom of these charges and uncover whatever lay beneath them.

(6) "Accordingly, he engaged a Rockford attorney and filed suits for slander against six members of his congregation. Named as defendants were Mrs Sylvia Sodamon, Wallace Best, Edgar Best, A. E. Swinson, Jud Van Sickle and Albert Fritz, the postmaster. He asked for $50,000 from each for malicious defamation of character.

"The suits were regarded locally as mere gestures to check town gossip, although nobody could figure out why he picked on those six people in particular.

"On the night of May 30 Warren was given opportunity to acquaint a church jury with what he found as to the alleged frame-up. That night will be long remembered in Durand as a mighty occasion. Before a board of ministers and church officials a secret hearing was held while an excited crowd filled the streets outside and tried to keep up with proceedings by peeking now and then through an opening door or under the stained glass windows. Warren told his story and Hazel Lamb told hers. Numerous witnesses, comprising neighbors and townspeople, also told what they knew of the case, and upon passing outside were immediately pounced upon by the crowd, eager for information.

"The hearing lasted until past midnight, and when it ended, announcement was made that Warren would depart on leave of absence but would continue to hold his standing as a minister until the charges could be passed upon by Rock River Conference at its October meeting. The Durand pulpit, meanwhile, would be filled by the Rev. Frank Sheets of the neighboring town of Oregon who had conducted Warren's prosecution.

(7) "The case came up on October 6 at the conference meeting in the Euclid Avenue Methodist Church at Oak Park. Fifteen brother Methodist ministers constituted the trial board with the Rev. Louis F. W. Lesemann of Chicago acting as judge. The Rev. Frank D. Sheets again conducted the prosecution, assisted by the Rev. Fred D. Stone, of Irving Park Church, Chicago, and Warren was defended by the Rev. John Thompson, of the First Methodist Church, Chicago, and the Rev. W. S. Fleming of Chicago.

"The trial was conducted behind closed doors and continued for more than two days. Warren's defenders tried to combat Hazel Lamb's story with contentions that she had been hired to tell it by Warren's political enemies and some declared the charges against the

minister were trumped up by a jealous faction in the church. Mrs. Lilly Young, wife of a Durand dentist, was one of these. She testified the whole thing was the result of a quarrel between Warren and Axel Erickson, a Durand clothier, over a tableau staged by the church.

" 'Mr. Erickson was instructing the girls how to wear their costumes,' she said, 'when the Rev. Warren came in. Some of the girls were so scantily clad that Mr. Warren ordered Mr. Erickson out and told the girls to put on more clothes. That was the start of the whole thing.' Others gave a similar testimony.

"But Hazel Lamb's story set forth clearly that the start of the whole thing had taken place sometime before the tableau argument. She told it on the stand and although Warren was hopeful to the last, his case, according to the prosecutors, was doomed from the time she left the chair. Anyway, when the sealed verdict was delivered, it was found that 12 of the 15 ministers had voted 'guilty'. One was for acquittal and two had failed to vote. Only a majority vote was required and conviction automatically carried the penalty of dismissal from the ministry and the church.

(8) "The girl's testimony at the hearing followed closely the account she had given in a sworn statement previously placed in the hands of the conference authorities, and set forth the fact that Pastor Warren began his wooing the day before the new Durand Church was dedicated.

" 'It was on Saturday evening, September 13,' she related, 'that I was asked by Mrs. Warren to work at the parsonage on Monday. I accepted the offer and helped her most of that week. One evening just before the church dedication Mr. Warren drove me home from the parsonage. He put his arm across the back of the seat and then around my shoulders. He had been working very hard that day and seemed unusually tired. I sympathized with him as I would with a brother. Several days passed and I helped Mrs. Warren when she asked me. One day while I was helping Mr. Warren look for a book in his study he made advances and I was angry, and when he seemed sorry I forgave him.

" 'A few days later I was in the house alone with him. Mrs. Warren had gone downtown to settle for an overcoat. I was getting supper and Mr. Warren was in the dining room. He called to me. I started in but the light was off and I hesitated. He was near the door and forced me into the room. I was afraid to scream and was so frightened I could only moan. The next few minutes are not very clear. I remember asking him if he had no more mercy than a beast and after awhile I struggled away. I thought then that I hated him, but his eyes fascinated me. I would turn my head and close my eyes but he always made me look back into his eyes. It gave me the chills.

" 'This kept on until I came to believe I was in love with him.

He said he loved me and was going to take me to Washington with him when he was elected to Congress. I had no desire to break up his home and fought against meeting him but I was powerless to do anything he didn't want me to. One Friday evening when Mrs. Warren was away he came home and asked me to meet him again that night at the parsonage. I refused at first and then finally consented. Then again one night in October I went to his darkened home. He carried me upstairs. After that it didn't seem to make any difference and I quit trying to break off.

" 'On the morning Mrs. Warren saw us I had gone down early and was taking some clothes from the rack when he came up from the basement and put his arms around me and told me how much he loved me. Then Mrs. Warren came in. She grabbed the stove shaker and hit him on the head. Then she tried to choke me and beat me with her fists. She had an awful spell. She would scream, call on the telephone and run from one end of the house to the other. When she asked me for an explanation I tried to deny it but couldn't lie very long. Then I told her everything.'

(9) "Although ousted from the pulpit and with prospects for a 'come-back' very slender, Warren is still fighting for his job, which, he points out, is the only job he knows. He has appealed from the verdict of the Rock River trial board and the case will be reviewed by the General Methodist Conference at Kansas City next spring:

"When I saw him at his home in Rockford recently, he reiterated his declaration that Hazel Lamb's story was a clumsy frame-up and that in time he would prove it. It is clear, he pointed out, that she didn't think of it herself but was telling merely what she was told to tell. Disappointed in his effort to shake the girl's version in two church trials, he now is gathering further evidence for use in the civil hearing where, instead of ministers, lawyers skilled in cross-examination will ask the questions. The odds against him seem pretty heavy with his former congregation 90 per cent against him but it can't be said that John A. Logan Warren isn't dying hard." (Numbers of paragraphs and italics ours.)

Plaintiff, as a witness in his own behalf, denied that he had been guilty of any of the misconduct charged by Hazel Lamb or related in the article, and told of controversies with members of his congregation over politics and the construction of the new church. He further testified that Hazel Lamb's mother and father came to his church for four months after January 14, 1927; that they took communion at his hands during that time; and that Albert Swinson, to whom the girl's father was said to have disclosed the matter and who was related by marriage to the Lambs, continued during that time as superintendent of the Sunday school. He also stated that he was not allowed to bring in all the witnesses he wanted at the church trial; that the witnesses were not sworn at the church trials; and that

his appeal from his church trial was dismissed without his consent. He testified that he had been a minister for over fifteen years; that he had served eight or nine pastorates; that since the publication of defendant's article by defendant people from Durand and Rockford who knew him and had been speaking to him would not speak to him on the street; that, thereafter his friends in St. Louis, East St. Louis, and Southern Illinois treated him differently; and that he has been working as a factory laborer. Plaintiff had as witnesses, two of the older women of his former congregation at Durand, Illinois, who said that they first heard of the accusations against plaintiff in May, 1927; that from January until May Hazel Lamb's mother taught a class in the Sunday school; that both her mother and father attended church and took communion from plaintiff; and stated that plaintiff treated the older women of his congregation with respect and was well liked by them. Plaintiff also had the testimony of a Rockford newspaper editor and one of the ministers who acted as his counsel at the church trial, about their interviews with the Post-Dispatch reporter, who wrote defendant's article; had as witnesses the sister of his wife (Mrs. Warren died in 1928), who said that Mrs. Warren never contemplated a divorce; and had a former instructor at McKendree College in Illinois (near St. Louis) where plaintiff went to school, who said that he saw defendant's paper containing the article; but had read accounts of the matter before it appeared.

On behalf of defendant it was shown that the reporter, who wrote the article, made a trip to Durand and Rockford in August, 1927, after the first hearing of the matter before the church at Durand; that he then talked to the editor of the Durand paper and the editors of the two Rockford papers, as well as some of the people in Durand, but that he did not write any article at that time. This reporter made a second trip there, late in October, after the trial at the Methodist Conference in Chicago. At that time, he again talked to the editor of the Durand paper, to other people in Durand and also to the editors of the Rockford papers. On that trip he saw plaintiff himself, who said "this is a clumsy frame-up . . . no truth in the charge." He said: "I preferred to take the girl's statement to his." On that trip he collected the articles written by the Rockford and Chicago papers about the case. Articles from the Rockford Register-Gazette published during the trial before the conference were introduced in evidence. These articles were published on October 3, 4, 6, 7 and 8, 1927, and told of the progress of the trial, the contentions of both plaintiff and Hazel Lamb, rumors as to what was going on in the trial and reports concerning the feeling in Durand. Another article from the same Rockford paper, published October 10th, announcing the result of the trial and describing how it was received, was introduced. Articles from the Chicago Herald & Examiner published during the trial on October 7, 8 and 9 were also

introduced in evidence, which gave in more detail than the Rockford paper the events of the trial at the Methodist Conference in Chicago, the contentions made there, the result of the trial, and the reception of its announcement. There was also introduced an article from the Chicago Evening American of October 10, 1928, entitled "Hazel Lamb's Own Story of Warren" in which the principal parts of the affidavit, which she made in May, 1927, about the matter, were set out. This article giving her story stated that she was the "accuser of the Rev. John A. Logan Warren, former pastor of the First Methodist Church of Durand, Illinois, found guilty in one of the most sensational trials in recent ecclesiastical history." This article was similar to the story of Hazel Lamb's testimony set out in the last paragraphs of the defendant's article. The reporter said that he read all of these articles and used the information contained in them in writing his article. Some of the pictures published in the Chicago papers were also offered in evidence. The reporter also said that he talked to Hazel Lamb's father and showed him the statement printed in the Chicago paper and that "he said she had made such a statement and had sworn to it." He further said: "I went to some trouble to get the article, an article that would read kind of well . . . a reporter always has in mind the fact to make a story attractive, readable. . . . There is a class who undoubtedly like that stuff." He further said that he believed his information to be true and that he had no malice toward plaintiff.

Defendant produced a number of witnesses from Durand who testified that plaintiff's reputation there for morality and chastity, after the church trials, was bad. Defendant also had the testimony, by deposition, of Hazel Lamb that the entire story stated in her affidavit was true; that she wrote it all herself; and that plaintiff did have sexual relations with her. Defendant also had present at the trial the mother of Hazel Lamb and other witnesses from Durand who corroborated various parts of her story and told of other incidents in connection with the case. Among these were Mrs. Graham and Mrs. Swinson, who lived on each side of the Durand parsonage on January 14, 1927, and who related that there was sufficient commotion to attract attention and that they saw or heard Mrs. Warren crying and hollering and going from room to room. Mrs. Graham said she saw Mrs. Warren come out on the porch, saw plaintiff pull her back into the house, and saw Hazel Lamb go home afterwards (walking not running). Neither of these neighbors said she ran out "to see what the excitement was about," but Mrs. Graham watched and listened from her home while Mrs. Swinson's attention was attracted while she was at her coal shed. Defendant also put in evidence the report of the conference showing the proceedings at the trial, the verdict sustaining the charges against plaintiff, the vote to expel him from the ministry and membership in the church, and the

order that the result be made public. A photostatic copy of the testimony at the church trial was offered in evidence but plaintiff's objection to its admission, as not properly identified, was sustained. Further material facts shown in the evidence will be referred to later.

■ Defendant's first contention is that the court should have sustained its demurrer to the evidence. It contends that the evidence shows that the occasion was one of great public interest; that the account was a fair statement of the whole matter in the belief that it was true; that the publication was without malice; that it was qualifiedly privileged; and that plaintiff, having failed to show malice, bad faith, or knowledge of defendant that it was false, failed to overcome the privilege. Plaintiff's theory is that he produced evidence tending to show that the charges against him were not true; that the jury believed his evidence and found them to be false; that the publication was not privileged because there was no duty to publish it and because plaintiff was not a public officer; that, if it was qualifiedly privileged, the privilege was lost because matters outside those privileged were included in the article and its headlines; and that in any case, there was a jury case because there was evidence of malice.

Since the truth is always a defense to libel, where only true facts are stated, no defense of privilege is necessary. Likewise, since there is no right to knowingly spread false facts about anyone, there can be no question of privilege to do that. A question of privilege properly arises, when the publication of a statement of true facts also contains a report of charges or statements made by others which may not be true. A somewhat similar question is presented when an article contains also inferences by way of comment, which may not be true, although drawn from true facts. [36 C. J. 1279-80, sec. 280; Newell, Libel & Slander, 519, sec. 480.] Ordinarily, no one has the right to broadcast incorrect inferences and conclusions about another's motives, intentions, and conduct (36 Cyc. 1281, sec. 283) ; and nothing is better settled than the proposition that no one is justified in stating false facts about another merely because some one else has done so. It is usually not in the public interest for a person to do either, concerning other persons, because there is no surer way of stirring up strife and because, in the language of the street, it is usually "nobody's business." However, in a government "of the people" there are matters which, although they concern individuals, become "everybody's business." This is where the doctrine of privilege steps in. ■ If a person is charged with violating the law or the rights of others and the matter is brought into court, there is an absolute privilege from an action for libel or slander to state before the court, even falsely and maliciously, facts relevant to the proceedings. [17 R. C. L. 330-340, secs. 77-87; 36

C. J. 1239, sec. 204, pp. 1250-61, secs. 223-240; Newell on Slander & Libel (4 Ed.) 388, 391-412, secs. 351, 357-384.] Testimony in a church trial has, likewise, been held privileged. [York v. Pease (Mass.), 2 Gray, 282.]

The proceedings in such cases may be related by publication of the charge, the evidence and the result reached by the court, but this right is only qualifiedly privileged. These procedings are permitted to be published, "not because the controversies of one citizen with another are of public concern," but because the administration of justice is, and "every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed." [Newell, sec. 450.] Not only must the subject be one which the publisher is privileged to report, but his motive in doing so must be proper (free from malice) and his report must be fair and accurate. To keep within his privilege, the publisher need not publish the entire proceedings but whatever summary or abridgement he chooses to make, must be a fair statement, and when he undertakes to state additional facts, not brought out in the hearing but gleaned from his own investigation, he does so at his peril, if they are false, exactly the same as he would in connection with an unprivileged matter. [36 C. J. 1274, sec. 265; Newell on Slander & Libel, secs. 459-465.]

■ One also has the right (and this applies to a newspaper which is properly in the business not only of giving the public news but also of making them think about its significance) to comment upon true facts, when they are matters of public concern, by stating his inferences and conclusions about them. One may even be wrong in the inference he draws from true facts, which may be susceptible of more than one interpretation, and may even state such inferences critically and sarcastically and not be guilty of libelous defamation (36 C. J. 1283, sec. 287) ; but to stay within the field of this privilege, he must not state his conclusions as facts, unless they are true. [36 C. J. 1282, sec. 285.] The right to comment or criticize means the right to draw inferences from facts, subject to the qualification that the facts are true; that the inferences are reasonable; and that they are made in good faith and without malice. [36 C. J. 1279-1283, secs. 276-289.] If facts and comments are stated in the same article, it should clearly show what are facts and what are merely the writer's conclusions therefrom. [Newell on Slander & Libel, sec. 464.] One important field of comment and criticism is the discussion of the qualifications, character and ability of public men. There is a privilege to discuss these matters because these are, in a free country, matters of public concern, and it is the public interest to freely discuss them; that is to do so truthfully but not to lie about them. Too wide a latitude in attacks upon character would be detrimental to the public good because it would tend to keep worthy and honorable

men out of the public service. [See Freedom of Public Discussion, 23 Harvard Law Review, 413.]

There was a time when it was considered the best public policy to prevent any criticism of those in authority. In England in 1704 Lord Holt, in The Queen v. Tutchin, 14 How. St. Tr. 1505, said: "If persons should not be called to account for possessing the people with an ill opinion of the government, no government can subsist, for it is very necessary for all governments that the people should have a good opinion of it." The change from this rule in England is shown by the following statement from Kelly v. Sherlock, L. R. 1, Q. B. 686: "Every man has a right to discuss matters of public interest. A clergyman with his flock, an admiral with his fleet, a general with his army, a judge with his jury, we are all of us the subject for public discussion." The view of our own court has been thus stated: "It is only in despotisms that one must speak *sub rosa*, or in whispers with bated breath, around the corner or in the dark on a subject touching the common welfare. It is the brightest jewel of the crown of the law to seek and maintain the golden mean between defamation, on one hand, and a healthy and robust right of free public discussion on the other." [Diener v. Star-Chronicle Pub. Co., 230 Mo. 613, l. c. 630, 132 S. W. 1143, 33 L. R. A. (N. S.) 216.] The difference between discussion and defamation is well stated, as follows: "It is not the law, that, because a man fills a station before the public eye, he becomes thereby a target. . . . Public station may ever be purified, never vilified." [Shurtleff v. Stevens, 51 Vt. 501, 31 Am. Rep. 698.] But everyone who would assume responsibilities of leadership, either in politics, in religion, or in thought, puts in issue, to some extent at least, his character, his good faith, his ability, and his sincerity and these qualities become matters of importance and interest to all other citizens and any individual or newspaper has the right to fairly and reasonably discuss them. Nevertheless, this right is limited to the discussion of facts, true facts.

Although the question has not often come before the courts, there is good authority for holding that a trial before a church body or other voluntary association which has jurisdiction over the case is a quasi-judicial proceeding and that there may be a qualified privilege to report such procedings just as in the case proceedings before courts of justice. [Annotation 63 A. L. R. 649; 36 C. J. 1278, sec. 274; 17 R. C. L. 369, secs. 118-119; Shurtleff v. Stevens, 51 Vt. 501, 31 Am. Rep. 698; Farnsworth v. Storrs (Mass.), 5 Cush. 412; Kelly v. Tinling (1865), 1 L. R. Q. B. 699; Gattis v. Kilgo (N. C.), 52 S. E. 249, 38 S. E. 931; Barrows v. Bell (Mass.), 7 Gray, 301, 66 Am. Dec. 479; Kirkpatrick v. Eagle Lodge, 26 Kan. 384, 40 Am. Rep. 316; Bass v. Matthews (Wash.), 124 Pac. 384; Redgate v. Roush, 61 Kan. 480, 48 L. R. A. 236, 59 Pac. 1050; Lothrop v. Adams, 133 Mass. 471,

43 Am. Rep. 528; Cranfill v. Hayden (Tex.), 55 S. W. 805; Landis v. Campbell, 79 Mo. 433.]

In Shurtleff v. Stevens, supra, the court held that charges of unfitness against a minister, made before a church tribunal, were such as to "justify public comment in a denominational publication;" that "if the publication reached the general public, the privilege is not lost;" and that "the only limitation that attaches to the privilege is (as in the case of proceedings of courts), that the publication must not be made for the purpose of inflicting an injury but to promulgate facts which duty or interest require to be promulgated." The court gave as reasons for its holding that:

"The general public not immediately related to these clergymen by the ties of church covenant or society relationship, are more or less directly within the range of that moral influence which they are charged to exert. Thus the general cause of public morality which underlies all good government, and which every good citizen, be he priest or layman, is bound to promote, is affected by the fidelity with which ministers of the gospel discharge the high trust of their appointment. In order to be successful public teachers of morality, they must be unspotted public exemplars of it. Hence, if it be suspected that a wolf in sheep's clothing has invaded their ranks, and sits at their council board, it is not only for the *interest* of all the members of the association to know the fact, but it is their *imperative duty,* to make inquiry and *ascertain* the fact." (It would seem, therefore, that the public would have some interest in knowing the result.)

In Farnsworth v. Storrs, supra, the court held that reading before the congregation "the decision agreed on in church meeting and ordered to be promulgated" was qualifiedly privileged. The court said:

"Amongst these powers and privileges, established by long and immemorial usage, churches have authority to deal with their members, for immoral and scandalous conduct; and for that purpose, to hear complaints, to take evidence and to decide; and, upon conviction, to administer proper punishment by way of rebuke, censure, suspension or excommunication. To this jurisdiction, every member, by entering into the church covenant, submits, and is bound by his consent. . . . The proceedings of the church are quasi-judicial, and therefore those who complain, or give testimony, or act and vote, or pronounce the result, orally or in writing, acting in good faith, and within the scope of the authority conferred by this limited jurisdiction, and not falsely or colorably, making such proceedings a pretense for covering an intended scandal, are protected by law." (Likewise, it would seem to follow that when such proceedings are had and the result publicly announced that there should be a qualified privilege to report them to the general public, if it is a matter of public concern.)

In Barrows v. Bell, supra, where a physician was expelled from a medical society and brought suit for libel because an article about the matter was published in a medical journal, the court said:

"A somewhat larger liberty may be claimed in this country (than in England) . . . both for the proceedings before all public bodies, and for the publication of those proceedings for the necessary information of the people. So many municipal, parochial and other public corporations, and so many large voluntary associations formed for almost every lawful purpose of benevolence, business or interest, are constantly holding meetings, in their nature public, and so usual is it that their proceedings are published for general use and information, that the law, to adapt itself to this necessary condition of society, must of necessity admit of their public proceedings, and a just and proper publication of them, as far as it can be done consistently with private rights."

In Kelly v. Tinling, supra, the court held that a church dispute was a matter of such public interest that a newspaper had a qualified privilege to print letters written about it by a church warden and in criticism of his clergyman. The court said:

"The maintenance of decency and propriety in conducting public worship and of the sanctity of the sacred edifice and all connected with it, is surely a matter of the greatest public concern. The very use of the term 'public worship' shows this."

This court in Landis v. Campbell, supra, citing many of these cases, applied the rule of qualified privilege to the making public of the decision of a church tribunal, saying:

"If a judicatory of a church has jurisdiction, by its laws, to try a member for an offense involving immorality, its decision is final, and not subject to be reviewed by the civil courts for alleged errors; that the civil courts will not examine into the question of errors in the proceeding, but give it the same force and effect as if it had been regular in every respect. . . . The acts of the session in suspending and expelling plaintiff afford a complete defense to this action, unless the charges against plaintiff were false, and the members of the session maliciously and falsely, or colorably made such proceedings a pretense for covering an intended scandal. (Citing cases.) . . . The reading the preamble and resolutions of suspension was a publication within the meaning of that term, as employed in relation to libels; but when a member has been excommunicated, it may be promulgated by the pastor by reading the resolution of expulsion in the presence of the congregation, according to the practice of the church, and that act will, of itself, furnish no foundation for an action against him."

There is considerable difference between various kinds of privileged occasions. Some matters may be only communicated confidentially to others and not given to everyone. In such cases the

matter of duty and common interest are to be considered. In cases involving reports of proceedings as news to be given to the general public, it is the matter of public interest and concern which is most important. [For a classification of various matters to which the rule of qualified privilege extends see Newell, sec. 389.] The question of whether an occasion is one to which qualified privilege extends is for the court, but whether the article has kept within the privilege is for the jury. [Newell, Libel & Slander, 383, sec. 345; McClung v. Pulitzer Pub. Co., 279 Mo. 370, 214 S. W. 193; Lee v. Fuetterer Battery & Supplies Co., 323 Mo. 1204, 23 S. W. (2d) 45; Kersting v. White, 107 Mo. App. 265, 80 S. W. 730.] "The plaintiff may overcome the privilege pleaded either by proof that the publication was inspired by actual malice, or that the facts published and com-- mented upon were false." [Merriam v. Star-Chronicle Pub. Co., 335 Mo. 937, 74 S. W. (2d) 592.] The determination that the rule of qualified privilege applies to a case, where, as here, charges made by persons other than the publisher are reported, narrows the issue which defendant must meet and adds to the burden which plaintiff must carry, in the following particulars: Defendant does not have to prove that such charges are true, but only that it is true that they were made and that the account of them and the trial upon them, is fair and accurate; if that is shown by defendant plaintiff must prove express malice (improper motive) in publishing them. If there is no privilege, the truth not only of the publisher's statements but also of any he reports to have been made by another must be proven, and, therefore, under a plea of justification only, malice may be inferred from any false statement whether it be the publisher's own or his report of another's statement. Of course, when a publisher of a privileged matter, steps outside of his privilege and adds statements upon his own authority or states his conclusions as facts, and not as comment, the rule of justification rather than that of privilege *applies as to those statements.*

Ministers of the gospel are spiritual teachers and leaders of the people. Their influence and the influence of the church which sponsors them is great. It must be obvious, therefore, that proper qualifications and character for such a position are matters of public concern, especially in a country, such as ours, where there is complete religious freedom and the appeal of every church is solely the character of its teachings and the sincerity of its leaders. Facts relating to these things are news, which we think are matters of importance both to members of the church everywhere and to the general public as well, because "the general cause of public morality which underlies all good government . . . is affected thereby."

This public interest certainly extends to charges affecting these matters publicly made and tried before a tribunal which has jurisdiction, even though the tribunal be that of a church. Upon both

reason and authority, we think the rule of qualified privilege should be applied here. The charges were made for the purpose of determining the fitness of plaintiff to continue in the ministry as one of the leaders of his church and its communicants, and not to punish him for a crime against the law of the land. No other tribunal had jurisdiction of this matter, a fact which plaintiff recognized in submitting his case to it. [Farnsworth v. Storrs, 5 Cush. 412; Fairchild v. Adams (Mass.), 11 Cush. 549; Rodger v. American Kennel Club, 245 N. Y. Supp. 662; Landis v. Campbell, 79 Mo. 433.] Its decision was final upon this question except for appeal to its appellate body and plaintiff did not perfect an appeal, whether that was his fault or not, in accordance with its regulations. We, therefore, hold that defendant did have a qualified privilege to publish an account of the charges which Hazel Lamb made against plaintiff before the church tribunal, whether they are true or not, and also the proceedings and result there. We further hold that this privilege was necessarily not lost by printing it as a feature article in the magazine section. Merely because this matter was no longer "spot news" to be published on the news pages, as was done by the Chicago and Rockford papers while the trial was going on, does not mean that it was not still a matter of sufficient public concern to keep alive the qualified privilege. There are many matters of public interest which may be proper subjects of editorials, or feature articles long after they cease to be front page news. However, the manner of its publication was a matter for the jury to consider in determining whether defendant's motive in printing it was to report a proceeding of public interest or was mere sensationalism to give its readers a thrill.

But the fact that the occasion was one to which the rule of qualified privilege applies does not mean that defendant's demurrer should be sustained, because plaintiff is entitled to a verdict, if he can convince a jury either that defendant acted with express malice, even if the article states only what defendant was privileged to publish; or that the article goes beyond what defendant was privileged to publish and unfairly or inaccurately reports the charges and the trial; or states conclusions and inferences which go outside the field of fair comment; or makes statements upon its own authority purporting to be facts which are false. We think the above italicized portions of the article make it clear that there is a jury question as to whether the article does go outside of what was qualifiedly privileged. Especially the headlines and first four paragraphs are susceptible of such an interpretation by the jury. Consider the following matters: *Headlines*—The most prominent of these paraphrases the statement of Solomon that there are "things which are too wonderful for me" one of which is "the way of a man with a maid" (Proverbs. 30:19.) *"The Way of a Minister with a Housemaid. She Couldn't Resist His Eyes."* This does not refer to an account of proceedings, either

judicial or ecclesiastical, but rather it is susceptible of conveying the implication, before the reader starts on the facts of the article, that there was something improper in plaintiff's way and conduct. [See Lewis v. Clement, 3 B. & Ald. 702.] Then, seemingly to carry on such implication, the article commences: (1) "A sprightly (lively-gay) young minister." (Webster's Dictionary gives as examples, "a sprightly dance, a sprightly air" and "a sprightly youth," but not "a sprightly minister"); "He had a roving eye and a disposition to be friendly . . . . he liked the ladies . . . the younger ones;" "He was not quite the sort of a pastor the elder sisters admire" (because he was too sprightly? liked too much the younger ladies? or perhaps because of the occasion of the roving of his roving eye?); these rather unfavorable conclusions appear to be stated as facts. (2) "Worst mess . . . since . . . Elmer Gantry's affair . . . 'girl trouble' very similar to Elmer's (certainly conclusions and comparisons that were not likely to convey the idea of injured innocence). (3) This whole paragraph reads to be a statement of true facts, which, if true, would, of course, be the strongest kind of corroboration of Hazel Lamb's charges. It is an even more theatrical account of the kitchen incident than Hazel Lamb's affidavit. Mrs. Warren's announcement of her presence by a swat with the stove shaker makes a better and more *striking* story (such an incident no doubt would be shown that way in a movie comedy), but it is an improvement upon any description of the occurrence we find in the record. It is also, at least, an exaggeration if the article can be construed to imply that there was such commotion in the parsonage that morning as to disturb the quiet of the whole town of Durand; that it caused the neighbors to come running out (like they would to a fire?); that Hazel was seen to come running home almost in hysteria; that details were not lacking very long (days, weeks, or months?); and that before long the whole town had it. (4) This paragraph also makes several statements as facts and mixes them between statements purported to have been made by Hazel Lamb; and no statement can even be found in her affidavit that "after a blazing denunciation of sin he hastened from the pulpit to keep a tryst with her."

To be considered even more than these isolated statements, however, is the effect of the whole. This court has held that "a defamatory article must be read in its entirety and interpreted from its four corners.' [Davis v. Missourian Pub. Assn., 323 Mo. 695, 19 S. W. (2d) 650; State ex rel. Zorn v. Cox, 318 Mo. 112, 298 S. W. 837.] It is easy to give an overdrawn, exaggerated and false impression of any situation by adding a few facts seeming to corroborate serious charges, and especially can this be done by stating as facts mere conclusions drawn from other facts. The tendency to do this was noted in Christie v. Robertson, 10 New South Wales, L. R. 157, as follows:

"The error which is usually committed by those who bring themselves within the law of libel when commenting on conduct is in thinking that they are commenting when in point of fact they are misdescribing. Real comment is merely the expression of opinion. Misdescription is matter of fact. . . . To state accurately what a man has done, and then to say in your opinion such conduct is dishonorable or disgraceful, is comment which may do no harm, as everyone can judge for himself whether the opinion expressed is well-founded or not. Misdescription of conduct, on the other hand, only leads to the one conclusion detrimental to the person whose conduct is misdescribed, and leaves the reader no opportunity for judging for himself of the character of the conduct condemned, nothing but a false picture being presented for judgment.'' Especially would it be easy to present a false picture for judgment of the guilt of one charged with immoral conduct by misdescribing him and the surrounding circumstances of the case in such a way that the misdescription furnishes evidence of the truth of the charges.

Did defendant, by adding facts from its own investigation or by stating its conclusions as facts, misdescribe the situation and present a false picture detrimental to plaintiff? This article would not be libelous defamation of plaintiff because it reported the charges Hazel Lamb made in her affidavit, the trial thereof and its result. Those things were true. She made the charges, executed the affidavit, and stood by its statements at the trial, where, whether true or not, they were accepted and believed over plaintiff's denial. The charges and the result of the trial thereon were made public, and because they were matters of public concern defendant had, as we have held, a qualified privilege to print an impartial account of them. If defendant has done no more than that plaintiff must prove express malice to recover, but defendant had no right to add thereto corroborating facts upon its own authority, unless they were true, or to unfairly picture the situation by unwarranted conclusions of its own stated as facts. [For examples see Rex v. Fisher, 2 Camp. 563; The King v. Fleet, 1 B. & Ald. 379; Lewis v. Walter, 4 B. & Ald. 605.] It should be noted that plaintiff's appeal, to the authority of the church, was still pending when this article was published. What would make this article libelous, even in the absence of proof of express malice (because justification and not privilege is the defense to facts added on defendant's own authority), would be that it does go beyond the statement of and is more than an account of the charges against plaintiff, his trial, and the result thereof, and states further facts, purporting to have been discovered by defendant's own independent investigation, which are not true and which tend to corroborate and support the charges, and conveys the impression that plaintiff was in fact guilty of the charges. In short, that this article, instead of being an impartial account of the charges, became

propaganda in support of them. We do not say that this is true, but we do hold that there is a jury question as to whether or not it is true. The court properly overruled defendant's demurrer to the evidence.

However, the verdict cannot stand because plaintiff's instructions did not properly advise the jury of the true issues of the case as they are above stated. It would seem that the impression the jury would be likely to get, from the instructions given them, was that they were trying *de novo* an appeal from plaintiff's church trial. Plaintiff's main instruction authorizing a verdict commenced by calling the jury's attention to various details stated in Hazel Lamb's affidavit (including forcing her into a darkened room, compelling her to look him in the eye, and putting his arms around her on January 14, 1927) and required them to find that he did not do these things. It then repeated them all and required them to find that they were false statements. It further required them to find that the article was likely to convey to the public the idea that plaintiff had seduced Hazel Lamb, was untrue to his wife, immoral, etc., and that it was libelous and damaged his reputation, and instructed them, if they so find, they should find for plaintiff provided they "do not find for defendant under Instruction 4," which was defendant's instruction on its defense of qualified privilege. These instructions cannot be reconciled because plaintiff's Instruction 1 as well as all of the rest of plaintiff's instructions are drawn upon the theory that there was no privilege for the article at all. It is so argued in this court. Moreover, defendant's Instruction 4 did not alone fully explain the defense of privilege and defendant's Instruction J further explaining some of its features was refused. Plaintiff's Instruction 7 and defendant's Instruction 4 were also conflicting. Number 4 said defendant was not liable for publishing in good faith a fair account of the trial even though the charges (upon which plaintiff was tried?) made in the article were not true; while No. 7 said good faith was not a defense but should only be considered in mitigation of damages, if the article was false in the particulars set out in plaintiff's main instruction, which, as we have seen, referred to even some of the statements of details made in these charges upon which plaintiff was tried. This tended to further mislead the jury as to the real questions before them for decision. Of course, if plaintiff did have sexual relations with Hazel Lamb he could not be libeled by anything defendant had published, tending to convey the impression that he was guilty of such immoral conduct, but showing only that her charges were untrue did not entitle him to recover. Defendant, having a qualified privilege to report the trial, plaintiff had to also show that defendant either with express malice published an account, of the actual charges made against him and the trial thereof, or that it had published an account thereof in an unfair manner, or that, even if it had reported the actual charges and trial fairly, it had published

as facts matters which were not true, or made unwarranted comments tending to show that plaintiff was really guilty of the charges Hazel Lamb had made against him. We think there was a jury question on all these hypotheses but we hold that plaintiff's instruction did not correctly present these issues to the jury as the issues which they must decide in plaintiff's favor in order to find a verdict for him. The jury should have been instructed as to what was privileged and what would go beyond the privilege.

 The jury would undoubtedly be further misled and left, without proper guidance as to the issues by plaintiff's Instruction 5, telling them that if the article was libelous (came within the statutory definition which they were given in Instruction 2, but which did not make the requirements that it must be false and not privileged and did not refer to other instructions for these requirements) and in the particulars mentioned in the first instruction false (which as noted above did not distinguish between the charges made by Hazel Lamb and the facts stated by defendant upon its own authority) then the jury may infer that it was maliciously made." This was too broad a statement, since defendant had a qualified privilege to publish a fair and true account of the charges made by Hazel Lamb, the trial thereof and its result, and plaintiff had the burden of proving express malice insofar as the article did so. [Merriam v. Star Chronicle Pub. Co., 335 Mo. 937, 74 S W (2d) 592; State ex rel. Zorn v. Cox, 318 Mo. 112, 298 S. W. 837; McClung v. Pulitzer Pub. Co., 279 Mo. 370, 214 S. W. 193; Cook v. Pulitzer Pub. Co., 241 Mo. 326, 145 S. W. 480; Cornelius v. Cornelius, 233 Mo. 1, 135 S. W. 65; Newell, secs. 296, 342.] This is because "the privilege is said to rebut the presumption of express malice implied (in other cases) from the defamatory subject matter." [Lee v. Fuetterer Battery Co., 323 Mo. 1204, 23 S. W. (2d) 45.] What plaintiff had to show to prove express malice was that the publication, insofar as it was privileged, was not made in good faith to give a fair and impartial account of the charges, trial, and result which were matters of public concern and about which it was privileged to inform the public, but that it was done with a wrong motive. That is what malice is; the presence of an improper motive. [McClung v. Pulitzer Pub. Co., 279 Mo. 370, 214 S. W. 193; Newell, sec. 273.] "Proof of the falsity of the facts and knowledge of such falsity is proof of actual malice;" (Cook v. Pulitzer Pub. Co., 241 Mo. 326, 1. c. 362, 145 S. W. 480) because that does, unquestionably show a wrong motive. Therefore, if defendant has added material facts on its own authority, which it knew to be false, it would thereby go outside of its privilege and malice would be inferred. It is likewise a wrong motive, which would tend to show malice to state something as the truth without knowing whether it is true, recklessly, and without any reasonable attempt to find out about it or with complete disregard of other known facts. [37 C. J. 78, sec.

483, p. 84, sec. 499; Newell, sec. 277.] Therefore, malice could properly be found by the jury if they believed that the article was a fair account of the charges, trial and result thereof, but believed from other evidence that it was published from a wrong motive; or if they believed it was not a fair and true account of the charges, trial, and result thereof; or if, although if it did contain such a fair and true account, it also contained other statements of fact which were not true; but they could not infer malice merely because they did not believe that all of the charges Hazel Lamb made against plaintiff to the church board were true, since defendant had a qualified privilege to publish what she charged there. The jury was not, therefore, properly informed by plaintiff's instruction on malice. Defendants were entitled to an instruction on the burden of malice but not to either of those they requested because they were likewise too broad because they overlooked the fact that the jury had the right to find that defendant had added false statements upon its own authority, and that if they so found malice could be inferred because of that.

■■■ We think it was also prejudicial error to admit in evidence the result of plaintiff's suit against the members of his Durand congregation for conspiracy to defame him and to permit plaintiff to testify that people from Durand refused to speak to him after the publication of defendant's article. Who knows what the defendants in the other case said about plaintiff? While lawyers would know that a case between plaintiff and other parties involved different issues, different evidence, and different legal principles, laymen would naturally feel that matter was the same as in the case on trial between plaintiff and defendant and would be likely to come to the conclusion that the question being tried had already been decided. They would very likely think that they had the right to consider the judgment of this other court, in making their decision as to the truth of the charges of immorality, from the very fact that the court, after objection and without in any way limiting its effect, allowed it to be stated in evidence. We do not allow a jury in a condemnation case to have the result of the award of commissioners in the same proceedings, because they would likely be influenced by it. How much more likely is it that a jury would be influenced by the judgment of a court, which they were led to assume had tried out this matter in the county in which the incidents were alleged to have occurred? In view of statements made about this suit in defendant's article, it was proper to allow plaintiff, as he did, to testify that he had prosecuted that suit to final determination but it was not proper to bolster up plaintiff's case against defendant by stating the result some other court reached in a similar case against others. It is true that the court gave an instruction limiting the consideration of this evidence to whether the witness, who was a defendant in that case, "was prejudiced or biased against plaintiff" but that did not cure the error for the reason that

evidence of the result of the other case was not even proper for that purpose. Nor do we think it can be held that defendant waived the error of its admission by attempting to minimize its effect by getting the best instruction limiting its effect, which the court would give. It is, of course, always proper to show that a witness is biased and prejudiced against the party to the suit against whom he testifies. To show this, evidence that there have been controversies between them are admissible; and to show the extent of the feeling between them even details of a controversy might sometimes be shown. The extent of such examination would be somewhat within the discretion of the trial court. [Barraclough v. Union Pac. Railroad Co., 331 Mo. 157, 52 S. W. (2d) 998, and authorities cited.] It might even be proper under some circumstances to show that the party recovered a judgment against the witness in some controversy not related to the case on trial, but it certainly was not proper when the judgment in the other case appears to decide the question involved in the case being tried. [Nadler v. Willen, 190 N. Y. Supp. 577.]

Likewise, it is proper to show that, after publication of a libel, people who formerly were friendly with the one libeled had changed their attitude toward him, where it is shown that they read it or were informed of it or even that it had been circulated in their neighborhood or community to such an extent that it would be a reasonable inference that they did know of it: and where it is shown or is a reasonable inference that the reading of the article caused the change in attitude. [Burrows v. Pulitzer Pub. Co. (Mo. App.), 255 S. W. 925.] That is not the situation here. There was no showing in the first place of any such circulation that it could be inferred that the people, whose conduct toward plaintiff was complained of, read defendant's article. [Kersting v. White. 107 Mo. App. 265. 80 S. W. 730; Crandall v. Greeves. 181 Mo. App. 235 168 S. W. 264; Julian v. Kansas City Star. 209 Mo. 35. 1. c. 139 (dissenting opinion), 107 S. W. 496 ] In the second place. it is not a reasonable inference that it would be the cause of their refusal to speak to plaintiff. The Post-Dispatch was not "telling them" anything in Durand, Illinois, in November, 1927. about the Warren case. It had been in the local paper. in the Rockford papers and in the Chicago papers. and more than that it had been a topic of village conversation ever since May. It would be a strained and far-fetched inference rather than a reasonable inference that the attitude of the people in the community toward Warren was changed when defendant's article was published, even if we could infer that it was read by them.

The judgment is reversed and the cause remanded. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.